**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **NORMAN JARRETT, and** | § | **CIVIL ACTION NO. 4:12-cv-00509** |
| **OTHERS SIMILARLY SITUATED,** | § | |
| **and JERRY THURMON,** | § | |
| Plaintiffs, | § | |
| | § | |
| **VS.** | § | **COLLECTIVE ACTION REQUESTED** |
| | § | |
| **POWER LINE SERVICES,** | § | **ASSIGNED TO THE HONORABLE** |
| **INC., and TOTAL ELECTRICAL** | § | **VANESSA D. GILLMORE** |
| **SERVICE & SUPPLY CO.,** | § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

_____**CONSOLIDATED WITH**_____

| | | |
|---|---|---|
| **JERRY THURMON, WAYNE** | § | **CIVIL ACTION NO. 4:11-cv-1365** |
| **THURMON, and OTHERS SIMILARLY** | § | |
| **SITUATED,** | § | |
| Plaintiffs, | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **POWER LINE SERVICES, INC.** | § | |
| **TOTAL ELECTRICAL SERVICE &** | § | |
| **SUPPLY CO., and SUN ELECTRIC** | § | |
| **SERVICES, INC.,** | § | |
| Defendants. | § | |

**PLAINTIFF JERRY THURMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**OF THE "NOT PAID ON A SALARIED BASIS"**
**ISSUE IN HIS FLSA CLAIM FOR UNPAID OVERTIME**

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF CITATIONS ............................................................................................. iv

SHORT SUMMARY OF THE ARGUMENT ...........................................................1

I.     INTRODUCTION TO DEFENDANTS' FLSA VIOLATIONS .......................2

      A.    The "Salary Basis" Requirement ...........................................................2
      B.    DOL Fact Sheet:  Improper Payroll Deductions Destroy Any Exemption.............2
      C.    Summary of the Payroll Deductions Plaintiff Suffered ........................2
      D.    The DOL Opinion Letter:  Any Deductions Not Listed Are Improper ................3
      E.    Defendants' Company-Wide Practice Of Making Improper Deductions...............4
      F.    These Deductions Destroyed The "Salary" Character Of Thurmon's Pay.............4

II.    NATURE AND STAGE OF THE PROCEEDING........................................4

      A.    The Early Pleading Challenges ............................................................4
      B.    Removal Of Related Action For Wrongful Termination And Consolidation.........5

III.   STATEMENT OF ISSUES PRESENTED.....................................................5

IV.   STATEMENT OF FACTS...............................................................................6

      A.    Defendants' Written Job Description For Plaintiff................................6
      B.    The Rule 30(b)(6) Witness Description Of Plaintiff's Principal Job Functions......6
      C.    Plaintiff Worked On Varied Job Sites Out In The Field........................7
      D.    Defendants Make Twenty-Five Payroll Deductions To Plaintiff (Totaling $2,500) For Damage To A Company Vehicle .....................................................8
      E.    Plaintiff's Expense Reporting Duties And The Related Deductions ....................8
      F.    Plaintiff's Responsibility For Charges Made By His Subordinates.......................9
      G.    Defendants Would Also Total Up Any Credit Card Charges Without Receipts At The Time Of An Employee's Termination And Dock Them From His Final Paycheck ..........................................................................................10
      H.    Plaintiff's Case Does Not Involve Personal Credit Card Charges.......................10

V.    LEGAL ARGUMENT AND AUTHORITIES SHOWING THE DEDUCTIONS WERE IMPROPER................................................................................................11

      A.    Deductions For Damaging Company Property Are Improper...............11
      B.    Improper Deductions To Other Employees Are Also Relevant ...........................11
      C.    Circuit Courts Have Held That Payroll Deductions For Violations Of Work Rules Relate To The Quality Of Work Performed ........................................11
      D.    Courts Interpret The Term "Quality" Of Work Broadly .......................13
      E.    The DOL Agrees With The Courts – Deductions For Violations Of Work Rules Are Not Permitted ..............................................................................14

ii

      F.      Courts And Regulators Have Firmly Rejected Restitutionary Deductions ...........15

      G.     *Yuen's* Dicta Is A Deserted Island In The FLSA Legal Landscape......................16

            1.      Defendants admit phone charges relate to work quality............................16

            2.      At least three Circuit Courts and the DOL have rejected *Yuen's* dicta......16

            3.      *Yuen*'s applicability is limited if it applies.................................................17

VI.     AN ACTUAL PRACTICE OF DEDUCTION IS INDISPUTABLY PROVEN WHEN OVER 30 DEDUCTIONS ARE TAKEN..........................................................................18

      A.      Only A Small Number Of Deductions Are Necessary To Prove An Actual Practice...................................................................................................................18

      B.      A "Very Strong" Practice Of Deductions Was Part Of Defendants' Ordinary Course Of Business.........................................................................................18

VII.    CONCLUSION AND PRAYER ...................................................................................20

CERTIFICATE OF SERVICE.....................................................................................................21

# **TABLE OF CITATIONS**

## **Cases:**

*Auer v. Robbins*,
    519 U.S. 452, 461 (1997) ........................................................................15, 17

*Auer v. Robbins*,
    65 F.3d 702 (8th Cir. 1995), *aff'd,* 519 U.S. 452 (1997)......................12, 13, 18

*Baden-Winterwood v. Life Time Fitness, Inc.*,
    566 F.3d 618 (6th Cir. 2009) .........................................................................18

*Bankston v. State of Illinois*,
    60 F.3d 1249 (7th Cir. 1995) .....................................................12, 13, 14, 18

*Belcher v. Shoney's, Inc.*,
    30 F. Supp. 2d 1010 (M.D. Tenn. 1998).........................................................15

*Belt v. EmCare, Inc.*,
    444 F.3d 403 (5th Cir. 2006) ...................................................................15, 17

*Blackshear v. City of Houston*,
    1997 WL 450086 (5th Cir. Jul. 8, 1997) ................................................. 11, 12

*Friedman v. South Fl. Psychiatric Associates, Inc.*,
    139 Fed. Appx. 183 (11th Cir. 2005).............................................................18

*Lacey v. Indiana State Police Dept.*,
    810 F. Supp. 244 (S.D. Ind. 1992) .................................................................13

*Martin v. Malcolm Pirnie, Inc.*,
    949 F.2d 611 (2nd Cir. 1991)........................................................................18

*Pautlitz v. City of Naperville*,
    781 F. Supp. 1368 (N.D. Ill. 1992) ...........................................................13, 18

*Shockley v. City of Newport News*,
    997 F.2d 18 (4th Cir. 1993) ...........................................................................12

*Takacs v. Hahn Automotive*,
    246 F.3d 776 (6th Cir. 2001) .........................................................................18

*Yourman v. Giuliani*,
    1999 WL 799803 (S.D.N.Y. Oct. 7, 1999), *rev'd on other grounds*, 229 F.3d 124 (2d Cir. 2000) ................................................................................................13, 16, 17

*Yuen v. U.S. Asia Commercial Development Corp.*,
    974 F. Supp. 515 (E.D. Va. 1997) ............................................................................16, 17

**Statutes and Regulations:**

29 C.F.R. § 541.602 .................................................................................................... 2, 6, 20
29 C.F.R. §541.602(b) ............................................................................. 3, 6, 12, 14, 16
29 C.F.R. § 541.603(a)............................................................................................2, 18
29 C.F.R. §541.603(b) ...........................................................................................11

**Department of Labor Authorities:**

*Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside
Sales and Computer Employees*, 69 Fed. Reg. 22122, 22178 (Apr. 23, 2004) ......................15, 17

DOL Opinion Letter FLSA 2006-7, 2006 WL 940663 (Mar. 10, 2006) ........................ 3, 4, 11, 15

DOL Opinion Letter FLSA 1998, 1998 WL 1147730 (Oct. 29, 1998) ........................................14

DOL Opinion Letter FLSA 1998, 1998 WL 852766 (Apr. 27, 1998) ..........................................14

DOL Opinion Letter FLSA 1998, 1998 WL 852770 (Apr. 24, 1998) ..........................................14

DOL Opinion Letter FLSA 1997, 1997 WL 998049 (Dec. 5, 1997) ...........................................14

DOL Opinion Letter FLSA 1994, 1994 WL 1004768 (Apr. 5, 1994) ..........................................14

DOL Opinion Letter 1991, 1991 WL 11693107 (Mar. 29, 1991) ................................................14

DOL Opinion Letter 1981, 1981 WL 601263 (Nov. 4, 1981) ......................................................17

DOL Fact Sheet........................................................................................................................2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **NORMAN JARRETT, and** | § | **CIVIL ACTION NO. 4:12-cv-00509** |
| **OTHERS SIMILARLY SITUATED,** | § | |
| **and JERRY THURMON,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **COLLECTIVE ACTION REQUESTED** |
| | § | |
| **POWER LINE SERVICES,** | § | **ASSIGNED TO THE HONORABLE** |
| **INC., and TOTAL ELECTRICAL** | § | **VANESSA D. GILLMORE** |
| **SERVICE & SUPPLY CO.,** | § | |
| **Defendants.** | § | **JURY TRIAL DEMANDED** |

_____**CONSOLIDATED WITH**_____

| | | |
|---|---|---|
| **JERRY THURMON, WAYNE** | § | **CIVIL ACTION NO. 4:11-cv-1365** |
| **THURMON, and OTHERS SIMILARLY** | § | |
| **SITUATED,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **POWER LINE SERVICES, INC.** | § | |
| **TOTAL ELECTRICAL SERVICE &** | § | |
| **SUPPLY CO., and SUN ELECTRIC** | § | |
| **SERVICES, INC.,** | § | |
| **Defendants.** | § | |

**PLAINTIFF JERRY THURMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT
OF THE "NOT PAID ON A SALARIED BASIS"
ISSUE IN HIS FLSA CLAIM FOR UNPAID OVERTIME[1]**

---

[1] Exhibits 17-18 and 5 (consisting of deposition testimony related to Exhibit 17) are filed under seal because Defendants designated Exhibits 17-18 as "Confidential Information."   Under an Agreed Protective Order (Case No. 4:12-cv-00509, Doc.12, Ex.B, ¶ 8), the designating party (Defendants) must file within five business days an affidavit(s) showing "good cause" for the court to protect these materials from public disclosure.

The issue presented by this Motion for Partial Summary Judgment is whether Plaintiff Jerry Thurmon was paid on a "salary basis" despite the fact that Defendants made 38 payroll deductions for violations of company rules from his salary and the salaries of a small group of other Substation Superintendents over a 14-month period.  During that time, deductions related to Superintendent job duties were taken for lost corporate credit card receipts, damage to company property, unauthorized spending of a direct report on a corporate credit card, and unauthorized charges on a corporate phone.  Plaintiff easily meets his burden of proving that these deductions relate to the quantity and quality of his work.

Plaintiff's job description, corporate policy, and Defendants' testimony attest to the fact that Plaintiff had a duty to turn in expense reports.  Hence, his alleged failure to turn in complete expense reports with all receipts clearly relates to both the quantity and quality of his work.  As a Superintendent, Plaintiff was held responsible for his equipment and actions of his crew, and therefore, the deductions for damage to property and the actions of his direct reports also relate to the quality of his work.  Finally, Defendants admit Plaintiff could be disciplined for unauthorized phone charges and thus those deductions relate to the quality of his work as well.

An actual practice of deductions is established by what Plaintiff's direct supervisor has characterized as a "very strong" policy of deductions.  Ex.2, Renteria 4:18-5:4, 184:21-187:15.  Defendants' deducted the pay of Substation Superintendents and thereby negated their salary guarantee in their ordinary course of business.  These deductions were "automatic" if a lost receipt could not be found.  Ex.1, Payne 37:22-38:1 (9 of the 15 rule violations resulting in deductions involved lost receipts).  When asked if his company "had a policy and practice of making payroll deductions if receipts were missing," Defendants' Rule 30(b)(6) witness responded "**[t]he company policy allowed us to do that, Yes.**"  Ex.3, Wasson 186:18-22.

## I.      INTRODUCTION TO DEFENDANTS' FLSA VIOLATIONS.

Defendants violated the Fair Labor Standards Act ("FLSA") by making numerous improper payroll deductions to Plaintiff Thurmon's weekly salary (and the salaries of other Substation Superintendents) – thereby destroying any exemption from the FLSA's overtime pay requirements that could arguably apply to Plaintiff because he was not truly "salaried."  From the deductions that Thurmon indisputably suffered, it is clear that Defendants failed, as a matter of law, to pay him on a "salaried basis."

### A.      The "Salary Basis" Requirement.

To qualify for exemption from overtime pay under the FLSA, employees generally must be paid on a "salary basis" at not less than $455 per week.  *See* 29 C.F.R. § 541.602.  Being paid on a salary basis means that an employee regularly receives a predetermined amount of compensation each pay period and that predetermined amount cannot be "subject to reduction because of variations in the quality or quantity of the work performed."  *Id.*

### B.      DOL Fact Sheet:  Improper Payroll Deductions Destroy Any Exemption.

The U.S. Department of Labor ("DOL") has published a "Fact Sheet" that further explains the salary requirement for the overtime exemptions.  As explained by the DOL, **an employer will lose an exemption if it has a practice of making improper deductions from salary.**  *Appendix ("App.") 1*, DOL Fact Sheet #17G, p. 2; 29 C.F.R. § 541.603(a) (an "employer who makes improper deductions from salary shall lose the exemption").

### C.      Summary of the Payroll Deductions Plaintiff Suffered.

Thurmon worked for Defendants as a Substation Superintendent from October 8, 2007 to July 29, 2010, building electrical substations.  Docs.29-30 (Ds' Answers), ¶¶ 4 & 6.[2]      The

---

[2] Unless otherwise noted, all Docket references are to filings in Case No. 4:11-cv-1365.

undisputed facts show that Defendants made the following improper deductions to Mr. Thurmon's pay:

> (1)       A total of $2,500 in deductions (processed in twenty-five separate deductions at $100 per week) for the insurance deductible for repairs made to a company vehicle (Exs.8-9);
>
> (2)       A $10.81 deduction for the purchase by one of his subordinates (Sam Gomez) of a cell phone accessory on his corporate credit card (Exs.10-11); and
>
> (3)       A total of $15.38 in deductions for "lost" receipts for charges to his corporate credit card (Exs.12-13).

Several other of Defendants' Substation Superintendents suffered similar payroll deductions for "lost" or "missing" receipts or allegedly unauthorized phone charges. Ex.17[SEALED].  In total, Defendants deducted the pay of Substation Superintendents 38 times for 15 violations of company rules in between May 1, 2009 and July 31, 2010.[3]

### D.      The DOL Opinion Letter:  Any Deductions Not Listed Are Improper.

Section 541.602(b) of the FLSA's implementing regulations, specifically lists the ***permissible*** deductions from salary.  29 C.F.R. §541.602(b).  In 2006, the DOL issued an Opinion Letter that makes clear that it **"interprets [§ 541.602(b)'s list of permissible deductions] to mean that <u>if a particular type of deduction is not specifically listed in section 541.602(b)</u> (formerly section 541.118(a)), <u>then that deduction would result in a violation of the 'salary basis' rule</u>."** *App. 2*, DOL Op. Ltr., 2006 WL 940663 *2 (Mar. 10, 2006) (emphasis added).  The DOL further specifically opined that deductions from the salaries of otherwise exempt employees for the loss, damage, or destruction of the employer's funds or property due to the employee's failure to properly carry out their duties (including where signed "agreements"

---

[3] In some instances, one violation resulted in many deductions.  For example, Defendants docked Plaintiff Thurmon's pay 25 times for a single instance of damage to a company vehicle.  Exs.8-9.  In other instances, multiple rule violations would be combined into one payroll deduction.  For example, in two instances where lost receipts were at issue, one deduction was processed for two lost receipts. Ex.17 [SEALED].

were used that purported to authorize such deductions) would defeat the exemption because the salaries would not be "guaranteed" or paid "free and clear" as required by FLSA regulations. *Id.* *2. Such impermissible deductions violate the FLSA's prohibition against reductions in salary due to the quantity or quality of work. *Id.* Consequently, any deductions made to reimburse the employer for lost or damaged equipment or funds would violate the "salary basis" rule. *Id.*

### E.       Defendants' Company-Wide Practice Of Making Improper Deductions.

Defendants have a policy and practice of making improper deductions from the salaries of employees, like Plaintiff Thurmon, that they have classified as salaried exempt who hold a corporate credit card and/or company-provided cell phone. Indeed, one of Thurmon's former direct supervisors, Armando Renteria ("Renteria"), a General Superintendent of Defendants' Substation Division, testified under oath that Defendants have a "**very strong**" policy of making payroll deductions for any credit card charges for which the employee has not provided an itemized receipt evidencing the business-related nature of the charge. Ex.2, Renteria 4:18-5:4, 184:21-187:15; Ex.3, Wasson 9:1-16; 11:17-13:13, 124:13-17 (TESSCO's policy was that "they could deduct for receipts not being turned in or personal expenses occurred on a card").

### F.       These Deductions Destroyed The "Salary" Character Of Thurmon's Pay.

The deductions that Thurmon personally suffered, as well as those that were suffered by other Superintendents, destroyed any notion that Thurmon was paid on a "salaried basis." There is no triable issue of material fact on the issue of whether Defendant had an actual practice of making deductions to Plaintiff Thurmon's pay that were not authorized under the FLSA.

## II.     NATURE AND STAGE OF THE PROCEEDING.

### A.       The Early Pleading Challenges.

Plaintiff Jerry Thurmon filed his FLSA action on April 11, 2011. Doc.1. Defendants

filed a Partial Motion to Dismiss on May 9, 2011.  Docs.10-11.  Judge Gray Miller granted Defendants' Partial Motion to Dismiss and *sua sponte* dismissed the balance of the case by Order entered August 4, 2011.  Doc.18.  Thurmon then filed a Motion for Reconsideration of the dismissal Order (Doc.19), which Judge Miller granted (i.e., reversing his earlier dismissal Order) by Order entered September 22, 2011.  Doc.21.  After Plaintiff filed a First Amended Complaint on October 7, 2011 (Doc.22), Defendants filed a new Motion to Dismiss (Doc.23), which Judge Miller denied by Order entered December 7, 2011.  Doc.28.

        **B.**       **Removal Of Related Action For Wrongful Termination And Consolidation.**

In the meantime, Defendants removed to this Court on February 21, 2012 the earlier-filed state case involving claims for wrongful termination filed by both Thurmon and Norman Jarrett. Case No. 4:12-cv-00509, Doc.1.  Defendants immediately filed Notices of Related Actions in both the FLSA case then before Judge Miller and the wrongful termination case before this Court.  Doc.42; Case No. 4:12-cv-00509, Doc.4.  Plaintiffs filed their Motion to Consolidate on March 8, 2012, which Motion was granted on July 5.  Case No. 4:12-cv-00509, Docs.9 & 34.

**III.**    **STATEMENT OF ISSUES PRESENTED.**

The issue in this Motion for Partial Summary Judgment is whether Plaintiff Thurmon was paid on a "salary basis" despite the fact that Defendants made 38 payroll deductions for violations of company rules from his salary and the salaries of other Substation Superintendents over a 14-month period.  Plaintiff respectfully submits that there is overwhelming legal authority demonstrating that a salaried employee cannot have his pay deducted for failing to turn in a piece of paper, such as a receipt or expense report, that is expressly made part of his job duties; for the failure of one of the subordinates that he supervises from turning in a receipt; for damaging company property; or for allegedly unauthorized telephone charges and still be considered

"salaried" under the FLSA.  These types of deductions simply are *not* authorized under 29 C.F.R. §541.602(b)'s exclusive list of permissible payroll deductions for salaried employees, and moreover, these deductions clearly relate to the quality of his overall work and therefore kill any notion of having been paid on a truly "salaried" basis.  29 C.F.R. §541.602.

## IV.   STATEMENT OF FACTS.

### A.    Defendants' Written Job Description For Plaintiff.

Defendants' job description for Plaintiff Thurmon states:

> "**Duties included obtaining materials**, **directing crews properly**, making sure the job was completed in a competent, safe and timely manner, making sure the plans and specifications provided by the customer were followed to the letter.  He was also responsible for the safety of the men on his crews and the safety and security of the job site.  **A large part of his responsibilities included submitting proper paperwork to supervisors and customers.**"

Ex.6 (emphasis added).  Thus, Plaintiff's written job description clearly delineates his duties to obtain materials and turn in paperwork associated with these expenses, as well as his duty to properly direct similar work of his crew members.  *Id.*[4]

### B.    The Rule 30(b)(6) Witness Description Of Plaintiff's Principal Job Functions.

Similarly, at his Rule 30(b)(6) deposition, Wasson testified to Plaintiff's *principal* job duties as a Substation Superintendent as follows:

> "Principal job duties were supervising the crew that he's responsible for; preparing the project report, time sheets for the crew; hands-on position.  So he might be there pulling wire and doing whatever just like everybody else in the crew, which is a very hands-on position.  **And preparing – Depending on the project and the customer requirements, the associated paperwork**."

Ex.3, Wasson 35:12-40:14 (emphasis added).

---

[4] In their second Motion to Dismiss, Defendants expressly admitted that "Thurmon's **duty** to turn in receipts for any charges made on his company credit card stemmed from his obligations under the Employee Expense Policy." Doc.23, p.10 (emphasis added).

Wasson further testified that Plaintiff's principal job duties also included purchasing supplies and completing a weekly expense report for charges placed on his corporate credit card:

> "Q.     Besides these job functions that Mr. Renteria discussed with you, as well as the addition of ordering materials or supplies or purchasing equipment and supplies in the field that you testified to, can you think of any other principal job duties for a superintendent?
>
> A.     The only one since you had mentioned it was, of course, filling out and completing his expense report if he's used his credit card."

*Id.*[5]  According to Wasson, "It's just part of their fiduciary responsibility for having a company credit card that they have a responsibility to turn that in [receipts] so we can properly record expenses and make sure they have been properly approved."  *Id.* 113:6-10, 122:2-17 (testifying receipts had to be turned in to comply with IRS regulations for the companies' tax returns).

With respect to the principal job duty of submitting proper paperwork to the office, Wasson testified that Renteria told him (as he prepared for his Rule 30(b)(6) deposition) that for Superintendents (like Thurmon) **"about 25 percent of the duties were related to paperwork."** *Id.* 63:18-65:11 (emphasis added).

### C.     Plaintiff Worked On Varied Job Sites Out In The Field.

As a Substation Superintendent overseeing the construction of electrical substations, Plaintiff worked out in the field, reporting to various job sites that were spread all over the country and staying in hotels or motor homes/trailers while he worked on a particular project. *Id.*, 40:15-41:25.

---

[5] Defendants' written "Employee Expense Policy" also documented Plaintiff's job duties to "[s]ubmit a weekly PLS Expense Report along with receipts and invoice for payment and no longer than 30 days from expense having been incurred."  Ex.7, ¶ 9.1(b); Ex.3, Wasson 106:8-107:11.

**D.**      **Defendants Make Twenty-Five Payroll Deductions To Plaintiff (Totaling $2,500) For Damage To A Company Vehicle.**

During Plaintiff's tenure with Defendants, Defendants had a practice of making restitutionary payroll deductions for damaging or losing company property. Ex.4, Chappell ¶ 7. Defendants made a total of $2,500 in deductions (consisting of 25 deductions at $100 per week and about two weeks' pay) from Plaintiff's pay for the insurance deductible for repairs made to a company vehicle that he had an accident in. Exs.8-9; Ex.1, Payne 112:10-114:4 ("Jerry backed into a car in the RV parking lot, if I remember correctly . . . so I guess Mondo made him pay for part of it – part of the damages."); Ex.3, Wasson 158:13-162:22 (disclaiming any knowledge[6] of the circumstances that led to these deductions beyond "damage to a company property, to a piece of equipment"); 163:17-165:3.

**E.**      **Plaintiff's Expense Reporting Duties And The Related Deductions.**

To comply with his expense reporting obligations, Plaintiff had to turn in receipts for any charges made to his corporate credit card to Shari Payne, Defendants' (then) Field Office Manager and Executive Assistant, in his weekly "Tuesday packet" of paperwork for Ms. Payne. Ex.1, Payne 5:10-17, 18:1-19:7, 36:8-38:1, 39:4-16; Ex.4, Chappell, ¶¶ 2-6; Ex.3, Wasson 46:15-48:3. Ms. Payne would call Thurmon to remind him to track down missing receipts. Ex.1, Payne 36:8-38:1. If the Superintendents (like Plaintiff), were "**not keeping up with their receipts**, then it [the charge without a receipt] gets deducted [from the employee's pay]," after Ms. Payne ran the deduction by the Superintendent's immediate supervisor and her direct supervisor, Darrell Hallmark, Defendants' Senior Vice President. *Id.*, 45:10-17; 107:14-108:3.

---

[6] Wasson failed to interview any person involved in the deductions of Superintendents regarding their practice of deductions or the details of any deductions. Ex.3, Wasson 9:1-16; 11:17-13:13; 34:21-35:16; 100:14-101:2. Notably, he spoke on the phone with Thurmon's supervisor (Renteria) regarding the job duties of Substation Superintendents, but not the practice of deductions. *Id.* 34:21-35:16.

As explained in the Affidavit of one of Plaintiff's former supervisors, Wayland Chappell, Defendants have a "policy and practice of making payroll deductions if an employee with a corporate credit card does not turn in a receipt for a charge to prove it was business-related." Ex.4, Chappell ¶ 3.  About once a month, Ms. Payne (or a field secretary) would send Chappell a list of all employees who had missing receipts for the month.  *Id.*, ¶ 4.  Chappell would then forward the e-mail to the affected employees and he would also call them to remind them to find or track down another copy of the missing receipts.  *Id.*  If an employee failed to turn in a receipt for all charges, then Chappell would receive a Payroll Deduction Form from either Ms. Payne or a field secretary to sign off on for a payroll deduction to be made in the amount of the charge for which there was no receipt.  *Id.*, ¶ 5.   As stated in his Affidavit, it was Chappell's understanding that this policy "applied to all employees with a corporate credit card (including me) and that the policy was applied automatically (i.e., there would automatically be a payroll deduction made for any charges without a receipt) over the past three years."  *Id.*, ¶ 6.

According to this policy and practice, Defendants docked Plaintiff $15.38 for a missing receipt to Home Depot in May 2009.  Exs.12-13; Ex.3, Wasson 128:13-130:22; 132:16-134:17; 152:14-154:17; 162:23-163:13 (no knowledge beyond that "it was done and that the document states it's a lost receipt for Home Depot" and "[a]gain, I have no knowledge of the transaction itself and the events around the deduction").

### F.    Plaintiff's Responsibility For Charges Made By His Subordinates.

A Superintendent was also responsible for any charges made by his crew members on his corporate credit card.  Ex.1, Payne 43:6-44:4 ("Now, sometimes they may have given their credit cards to one of their crew members to go purchase something, but ultimately the superintendent was responsible for what was purchased on his credit card.").   Defendants docked Plaintiff's pay

for a $10.81 charge that one of his crew members (Sam Gomez) placed on his corporate credit card for a cell phone accessory.   Exs.10-11; Ex.2, Renteria 184:21-187:15; Ex.3, Wasson 165:9-169:17 (disclaiming knowledge of circumstances that led to this deduction).

**G.    Defendants Would Also Total Up Any Credit Card Charges Without Receipts At The Time Of An Employee's Termination And Dock Them From His Final Paycheck.**

Defendants also had a practice of totaling up any credit card charges for which an employee had not turned in a receipt yet at the time of termination and then dock these amounts from the employee's final paycheck. Ex.1, Payne 55:15-56:17.  Defendants prepared a Payroll Deduction Form to take a $3.44 deduction from Plaintiff Thurmon's pay for another "lost receipt," but did not end up processing that deduction through payroll before Thurmon received what would be his final paycheck with Defendants.   Exs.13-14.   Defendants also prepared a Payroll Deduction Form while Plaintiff Thurmon was out on a medical leave of absence for a workplace injury in order to take a total of $348.28 in deductions from Thurmon's pay for various "missing receipt[s]," but did not end up processing those deductions because Defendants found the receipts in Thurmon's company truck.   Exs.15-16.

**H.    Plaintiff's Case Does Not Involve Personal Credit Card Charges.**

Finally, it is important to note that this case does *not* involve *personal* charges to a corporate credit card.[7]  In this regard, Defendants' Rule 30(b)(6) deponent testified that he had no knowledge of Plaintiff making any personal charge to a corporate credit card.  Ex.3, Wasson 187:1-11.

---

[7] Plaintiff makes this note to avoid any confusion, such as that experienced at the January 19, 2012 discovery conference, where Magistrate Judge Johnson requested clarification of whether Plaintiff's case was akin to a situation where an employee charged internet porn to a company account (i.e., clearly personal charges) and then the company sought to recoup such personal charges from the employee.  Doc.39, Transcript, 14:8-22.

## V.    LEGAL ARGUMENT AND AUTHORITIES SHOWING THE DEDUCTIONS WERE IMPROPER.

Legal authorities from every source support Plaintiff – payroll deductions for violations of work rules or failing to properly perform work duties simply *cannot* be made to salaried employees without destroying the "salaried" nature of their pay.

### A.    Deductions For Damaging Company Property Are Improper.

The DOL has specifically instructed that damage to company property relates to the quality of work in an Opinion Letter stating that:

> **"[A]ny deductions made to reimburse the employer for lost or damaged equipment would violate the salary basis rule."**

*App. 2*, DOL Op. Ltr., 2006 WL 940663 *2 (emphasis added).

### B.    Improper Deductions To Other Employees Are Also Relevant.

Notably, Defendants' pay deductions directed to *other* Superintendents further demonstrate that Thurmon was not in a "salaried" exempt position.   29 C.F.R. §541.603(b) (determination whether exemption is lost includes looking at deductions for other persons in the same job classification).   The Fifth Circuit has held that an employee's exemption can be destroyed without ever *personally* suffering a single deduction, so long as others in his job classification were improperly deducted.  *Blackshear v. City of Houston*, 1997 WL 450086 at *2 (5th Cir. Jul. 8, 1997).   Thus, the deductions made to *other* Substation Superintendents are relevant to show that Plaintiff was "subject to" improper deductions to his salary, and therefore, not  truly "salaried."  *See* Ex.17 [SEALED].

### C.    Circuit Courts Have Held That Payroll Deductions For Violations Of Work Rules Relate To The Quality Of Work Performed.

The appeals courts that have addressed the issue have *consistently* held that the *only* work rules for which an employee may be deducted are for *violations of safety rules of major*

*significance* – i.e., a form of deduction specifically listed in 29 C.F.R. §541.602(b)'s list of permissible deductions. *Shockley v. City of Newport News*, 997 F.2d 18, 24-25 (4th Cir. 1993) ("[D]isciplinary reductions in pay, other than for violations of major safety rules, constitute reductions in pay based on the quantity and quality of an employee's work."); *Bankston v. State of Ill.*, 60 F.3d 1249, 1253 (7th Cir. 1995) ("[T]he change does not permit deductions for other quantity or quality considerations, such as a penalty for violating rules other than safety rules of major significance."); *Auer v. Robbins*, 65 F.3d 702, 710 (8th Cir. 1995), *aff'd,* 519 U.S. 452 (1997) ("Conversely, an employee is considered nonsalaried, and thereby entitled to overtime compensation, if his compensation is subject to reduction for a violation of any other rules [than safety rules of major significance].").

The Fifth Circuit has also held that a policy of suspensions without pay for violations of rules of conduct created an issue of material fact as to whether an employee was paid on a salary basis. *Blackshear*, 1997 WL 450086 at *2. **Inherent in these decisions is the notion that if an employer creates a rule to regulate behavior, then it must relate to the quality or quantity of the employee's work in some tangible way.**

Defendants' "Employee Expense Policy" explicitly regulates the **quality** of purchases employees may make on the company's behalf. Ex.7. The policy states, in relevant part, that: "The purpose of this Policy is to establish the basis for the reimbursement of expenses legitimately incurred by employees transacting Company business and for the approval of expense reports." *Id.*, p.3. The policy created a duty for Plaintiff to turn in all receipts; therefore, regulating the **quality** of his work in regard to making purchases for company projects and mandating the **quantity** of corresponding expense reporting that needed to occur. *Id*., pp.5-6. The policy also regulated the **quantity** of his work by forcing him to track down and turn in

12

every receipt or risk be deducted.   If Plaintiff failed to properly perform these purchasing and reporting "duties," he was penalized the amount of his expenditure without any further investigation into whether the expenses he incurred were personal or business related.[8]  *Id.*

### D.    Courts Interpret The Term "Quality" Of Work Broadly.

Courts have interpreted the term "quality" of work broadly to include even an employee's behavior outside of work.   For example, in *Bankston*, the Seventh Circuit implicitly held that deductions for violations of rules of conduct preventing police officers from "gambling on their own time" were related to the quality of work.   *Bankston*, 60 F.3d at 1253 n.1.   Similarly, in *Auer*, the Eighth Circuit reasoned that a deduction resulting from a residency requirement rule for police officers was related to the quality of work.   *Auer*, 65 F.3d at 711.   Other federal courts have found violations of any work rule to be related to the quality or quantity of work.   *Pautlitz v. City of Naperville,* 781 F. Supp. 1368, 1372 (N.D. Ill. 1992) (disciplinary reductions for accepting sausage sandwiches as gratuities); *Lacey v. Indiana State Police Dept.,* 810 F.Supp. 244, 248 (S.D. Ind. 1992) (disciplinary reductions for insubordination, discourtesy or insolence, abuse of sick leave, tardiness, and uncleanliness, among other grounds); *Yourman v. Giuliani*, 1999 WL 799803 at *11 (S.D.N.Y. Oct. 7, 1999), *rev'd on other grounds*, 229 F.3d 124 (2d Cir. 2000) ("Thus, a deduction for misappropriation of Department property is based on the quality or quantity of the manager's work and is prohibited.").

Plaintiff's case is similar to these cases, because he too was subject to deductions if he violated a workplace policy or rule.   Plaintiff's case is in fact *stronger* than all of these cases, because obtaining materials and turning in proper paperwork are core duties of Plaintiff that were

---

[8] The policy operated as a boon to the company who could cut costs by charging its employees for company expenses.  Had the employee turned in the receipts for business expenses, the Defendants could only seek a tax write-off of the amount, but if an employee failed to turn in a receipt for business expenses, the Defendants benefitted from the whole expense being covered by the employee.

specifically listed in his job description. Ex.6. In contrast, it is doubtful that the employees in *Bankston* and *Paulitz* had specific bans on gambling on their own time or accepting sausage sandwiches as gratuities directly mentioned in their job description. The employees in these cases lost their exemption for violating rules that were only *marginally* related to the quality of their work, whereas Plaintiff was performing a core job duty when submitting expense reports.

### E.   The DOL Agrees With The Courts – Deductions For Violations Of Work Rules Are Not Permitted.

The DOL has also repeatedly stated that deductions for violations of work rules other than safety rules of major significance (again, as specifically listed within 29 C.F.R. § 541.602(b) as a permissible deduction) destroy an employee's exemption from overtime. *App. 3*, DOL Op. Ltr., 1998 WL 852766 *1 (Apr. 27, 1998) ("The only disciplinary type of deduction from the exempt employee's salary permissible is one imposed as a penalty 'in good faith for infractions of safety rules of major significance.'"); *App. 4*, DOL Op. Ltr., 1998 WL 1147730 at *1 (Oct. 29, 1998); *App. 5*, DOL Op. Ltr., 1998 WL 852770 at *1 (Apr. 24, 1998); *App. 6*, DOL Op. Ltr., 1997 WL 998049 at *1 (Dec. 5, 1997); *App. 7*, DOL Op. Ltr., 1994 WL 1004768 at *1 (Apr. 5, 1994); *App. 8*, DOL Op. Ltr., 1991 WL 11693107 at *1 (Mar. 29, 1991). Two of these letters go on to state that:

> [D]eductions from an exempt employee's salary for <u>minor</u> disciplinary infractions are not the kind of deductions permitted by the Regulations, and in our opinion would defeat the exemption for an otherwise exempt employee.

*App. 3*, at *1 (original emphasis); *App. 5*, at *1 (original emphasis).

It is hard to imagine a more minor infraction of a company rule than failing to turn in a typical 2in. x 4in. receipt, as Plaintiff is accused of doing. Who has not lost a receipt they intended to keep at least once? Plaintiff was charged with turning in **hundreds** of receipts as

part of his job duties each year.  The Regulations were not meant to permit disciplinary deductions based on his minor transgression of failing to turn in a **single** receipt occasionally.

### F.  Courts And Regulators Have Firmly Rejected Restitutionary Deductions.

Courts that have considered the issue of employees reimbursing their employer for losses have held that such reimbursements are improper deductions.  In *Belcher*, summary judgment was granted in favor of the plaintiffs who were subject to deduction for missing deposits and reimbursing the company for cash shortages.  *Belcher v. Shoney's, Inc.*, 30 F. Supp. 2d 1010, 1019-20 (M.D. Tenn. 1998).

The DOL has specifically stated that a manager cannot be deducted for "loss, damage, or destruction, of the **employer's funds** or property due to the employee's failure to carry out their managerial duties." *App. 2*, at *2 (emphasis added).[9]  Furthermore, when promulgating and amending regulations in 2004 related to the salary basis test, numerous comments were considered.  One commenter suggested "an additional exception to the general no-docking rule: payments in the nature of **restitution**, fines, settlements, or judgments an employer must make based on the **misconduct** of an employee." *App. 9, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22122, 22178 (Apr. 23, 2004) (emphasis added).  The DOL rejected the comment, stating that:

> *Such an additional exception, in our view, would be inappropriate and unwarranted because it would grant employers unfettered discretion to dock large amounts from the salaries of exempt employees in questionable circumstance.*

*Id*. (emphasis added).

The Regulations clearly intend for even those who commit misconduct in their duties to be guaranteed their full salary.  The Regulations recognize that an employee is in a poor position

---

[9] This agency opinion is "controlling unless plainly erroneous or inconsistent with the regulation." *Belt*, 444 F.3d at 408-17 (citing *Auer*, 519 U.S. at 461)).

to adjudicate what charges were authorized, who is to blame for those charges, and whether they actually turned in one of potentially hundreds of receipts their employer requested.

### G. *Yuen's* Dicta Is A Deserted Island In The FLSA Legal Landscape.

In their earlier Motions to Dismiss, Defendants cited to dicta in a district opinion from the Eastern District of Virginia, *Yuen v. U.S. Asia Commercial Dev. Corp.*, 974 F. Supp. 515 (E.D. Va. 1997), as ostensible authority for their payroll deduction practices.  *Yuen* involved cross-motions for summary judgment <u>where it was undisputed that neither the plaintiff nor any other employee had ever actually suffered any payroll deduction and there was not even any policy that permitted or required any deduction</u>. *Id.*, 520.   In *dicta*, the court opined that had Yuen's salary been deducted for her telephone calls, she would have maintained her exemption, because the quantity or quality of her work was not affected by the calls. *Id.*, 522-24.

#### 1.   Defendants admit phone charges relate to work quality.

*Yuen* is distinguishable because Defendants' 30(b)(6) rep admits that employees have a duty not to incur personal charges on company cell phones.  Ex.3, Wasson 194:8-12.    The 30(b)(6) rep also admits that employees can be written up or fired within the discretion of their managers for charges on company cell phones.  *Id.* 194:13-25.   Since Defendants admit employees can be written up or fired for unauthorized charges, it is hard to imagine how magically these deductions would not be related to the quality or quantity of work.

#### 2.   At least three Circuit Courts and the DOL have rejected *Yuen's* dicta.

As further discussed above, a tsunami of authorities have rejected the foundation of *Yuen's* dicta that an exempt employee can be deducted for violations of work rules *not* involving safety rules of major significance (as specifically listed in 29 C.F.R. §541.602(b)).  And the only court that has ever cited *Yuen's* dicta in a published opinion explicitly rejected it.  *Yourman*,

1999 WL 799803 at *11.  ("Thus, a deduction for misappropriation of Department property is based on the quality or quantity of the manager's work and is prohibited.").

Furthermore, as further discussed above, guidance issued along with new regulations promulgated *after* the dicta in *Yuen* specifically *rejected* restitutionary deductions for employee misconduct such as that at issue in *Yuen*.  *App. 9*, 69 Fed. Reg. at 22178.  Thus, the *Yuen* dicta (if it was ever correct) has clearly been superseded by new Regulations promulgated in 2004, which make it unequivocally clear that the DOL's regulations never intended for restitutionary deductions to be allowed even when employee "misconduct" is at issue.  *Id.*

*Yuen* is also directly contradicted by a DOL Opinion Letter which plainly states that deducting an employee for excessive "unauthorized" telephone charges can result in loss of the employee's exemption.  *App. 10*, DOL Op. Ltr., 1981 WL 601263 at *1 (Nov. 4, 1981).  DOL Opinion Letters are controlling on the issue unless "plainly erroneous."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Belt v. EmCare, Inc.*, 444 F.3d 403, 408-17 (5th Cir. 2006) (citing *Auer*).

### 3.    *Yuen*'s applicability is limited if it applies.

If this Court chooses to reject Circuit Courts, regulatory text, the Department of Labor and the facts testified to by Defendants' 30(b)(6) witness, *Yuen*'s dicta precedent would apply *only* to five violations of company rules regarding telephone charges for which six deductions were taken.  *See* Exs.8-13, 17 [SEALED].  Plaintiff still easily establishes an actual practice by showing ten violations for which 32 deductions were taken related to receipts, the purchases of direct reports, or damage to company property.  *See* Exs.8-13, 17 [SEALED].  A fundamental part of Plaintiff's job (as set out in his job description) was turning in proper expense reports and Defendants' Employee Expense Policy also charged him with a duty to turn in receipts.  Exs.6-7.  Defendants have thus implicitly admitted that any omissions he might have committed in doing

so are related to the "quality" of his work.  Other courts have reasoned that enforcement of far less fundamental rules is related to the quality of work.  *Auer*, 65 F.3d at 711 (residency requirement); *Bankston*, 60 F.3d at 1253 n.1 (gambling on own time); *Pautlitz,* 781 F. Supp. at 1372 (accepting sausage sandwiches as gratuities).

## VI.    AN ACTUAL PRACTICE OF DEDUCTION IS INDISPUTABLY PROVEN WHEN OVER 30 DEDUCTIONS ARE TAKEN.

### A.    Only A Small Number Of Deductions Are Necessary To Prove An Actual Practice.

Plaintiff's exemption from overtime is lost if an actual practice of deductions can be proven.  29 C.F.R. §541.603(a).  Courts have frequently held that an actual practice can be shown by just a small number of deductions.  *Friedman v. South Fl. Psychiatric Assocs., Inc.*, 139 Fed. Appx. 183, 184-85 (11th Cir. 2005) (directed verdict for plaintiff deducted **two** times); *Takacs v. Hahn Automotive*, 246 F.3d 776, 781 (6th Cir. 2001) (plaintiffs' summary judgment in class of 27 employees upheld based on **seven** deductions); *Baden-Winterwood v. Life Time Fitness, Inc.*,  566 F.3d 618, 622, 634 (6th Cir. 2009) (plaintiffs' summary judgment upheld based on **eighteen** deductions); *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 617 (2nd Cir. 1991) (employee's held not paid on salary basis where **24 out of 400 employees had been deducted**).

### B.    A "Very Strong" Practice Of Deductions Was Part Of Defendants' Ordinary Course Of Business.

Defendants had a clear actual practice of deducting monies from Substation Superintendents' pay for violations of rules that were not of major safety significance.  Between May 1, 2009 and July 31, 2010, Defendants deducted the pay of Substation Superintendents a total of 38 times for 15 violations of company rules.  *See* Exs.8-13, 17 [SEALED].  Eight of the fifteen violations involved deductions for receipts that the Superintendents allegedly failed to

turn in.  *See* Exs.8-13, 17 [SEALED].  Defendants' 30(b)(6) witness admits that deductions for

such receipts are part of the company's practice.

> "Q.     Would you agree with me that it appears from looking at Exhibit 17 that
> TESSCO had a policy and practice of making payroll deductions if receipts were
> missing?
>
> A.    The company policy allowed us to do that, yes."

Ex.3, Wasson 186:18-22.

Furthermore, these deductions were part of Defendants' regular course of business.  They

were taken if a Superintendent failed to turn in a receipt.  Ex.4, Chappell ¶ 6; Ex.1, Payne 37:22-

38:1; 117:7-118:4.  Thurmon's own supervisor Armando Renteria testified that the company had

a "very strong" practice of deductions.   Ex.2, Renteria 4:18-5:4, 184:21-187:15.   Wayland

Chappell, another supervisor of Thurmon, also testified that Defendants had a "policy and

practice of payroll deductions."  Ex.4, Chappell ¶ 3.

Given this admittedly "very strong" policy of deductions, the Sixth Circuit's reasoning in

*Hahn Automotive* is particularly persuasive:

> Autoworks, under Hahn's management suspended seven members of
> management including three of the managers in this case, without pay for a
> variety of disciplinary infractions.   In other words, every three months,
> Autoworks suspended one management employee without pay for disciplinary
> reasons… We believe that these occurrences coupled with the fact that Hahn does
> not claim these deductions occurred under unusual circumstances sufficiently
> demonstrate that Autoworks had an actual practice of suspending its managers
> without pay for disciplinary reasons.

In this case, a smaller group of at most twelve Superintendents[10] were penalized for violations of

company rules more than once a month over a fourteen month period.  *See* Exs.8-13, 17

[SEALED]. Over forty percent of the managers were victims of the policy.  *See* Exs.8-13, 17

[SEALED].  The Superintendents' salaries are clearly "subject to reduction based on variations

---

[10] Twelve Substation Superintendents worked for Defendants between April 2008 and January 2012. Ex.18
[SEALED].  In all likelihood a much smaller group of Superintendents worked for TESSCO between May 2009 and
July 2010, when the actual deductions occurred.

in the quality or quantity of the work performed."  29 C.F.R. §541.602.  Summary judgment for Plaintiff Thurmon is appropriate on the issue of his not being paid on a "salary basis" for all payroll periods between the first deduction in May 2009 and July 2010 when the last actual deduction was taken.

## VII.    CONCLUSION AND PRAYER.

For all of these reasons, summary judgment should be entered for Plaintiff Jerry Thurmon holding that he was not paid on a "salaried basis" under the FLSA.

Respectfully submitted,

_/Michael A. Starzyk/_____
**Michael A. Starzyk**
Texas Bar No. 00788461
Southern District of Texas Bar No.16926
**Stephen Ricks**
Texas Bar No. 00788278
Southern District of Texas Bar No. 36039
**April L. Walter**
Texas Bar No. 24052793
Southern District of Texas Bar No. 713287
**Hessam Parzivand**
Texas Bar No. 24071157
Southern District of Texas Bar No. 1129776
**STARZYK & ASSOCIATES, P.C.**
10200 Grogan's Mill Road
Suite 300
The Woodlands, Texas 77380
(281) 364-7261
(281) 364-7533 – Facsimile

**THE SEILER LAW FIRM, PLLC**
**Kenna M. Seiler**
Texas Bar No. 13944250
Southern District of Texas Bar No. 16468
8505 Technology Forest Place
Suite 1102
The Woodlands, Texas  77381
(281) 419-7770
(281) 419-7791 - Facsimile
**ATTORNEYS FOR PLAINTIFFS**

20

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been delivered to Defendants' counsel in accordance with the Federal Rules of Civil Procedure on the 2 day of August, 2012:

**Laurence E. Stuart**
**R. Glen Rigby**
**Hollie L. Reiminger**
**Cheri C. Thomas**
STUART & ASSOCIATES P.C.
909 Fannin, Suite 3250
Houston, Texas 77010

_____/s/ Michael A. Starzyk_____
Michael A. Starzyk

21