# EXHIBIT

# 1



NO. 10-12-13331

| NORMAN JARRETT and | § IN THE DISTRICT COURT OF |
| JERRY THURMON | § |
| | § |
| VS. | § MONTGOMERY COUNTY, TEXAS |
| | § |
| POWER LINE SERVICES, INC. | § |
| and TOTAL ELECTRICAL | § |
| SERVICE & SUPPLY CO. | § 284TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL AND VIDEOTAPED DEPOSITION OF
SHARI PAYNE
APRIL 5, 2011
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF SHARI PAYNE, produced as a witness

at the instance of the PLAINTIFFS, and duly sworn, was

taken in the above-styled and numbered cause on APRIL 5,

2011, from 1:52 p.m. to 5:37 p.m., before Linda A.

Rayburn, CSR, RPR, CLR in and for the State of Texas,

reported by machine shorthand, at the offices of Stuart

& Associates, 909 Fannin, Suite 3250, Houston, Texas,

pursuant to the Texas Rules of Civil Procedure and any

provisions stated on the record or attached hereto.



```
 1                    P R O C E E D I N G S
 2                 THE VIDEOGRAPHER:  We're on the record
 3       April 1st, 2011.  It's 1:52 p.m.  Beginning of tape one.
 4                      Would the court reporter please swear in
 5       the witness.
 6                            SHARI PAYNE,
 7       having been first duly sworn, testified as follows:
 8                            EXAMINATION
 9       BY MR. PARZIVAND:
10            Q    Please state your full name for the ladies and
11       gentlemen of the jury.
12            A    Shari Rene Payne.
13            Q    Okay.  And who is your current employer?
14            A    TESSCO.
15            Q    TESSCO.  What is your present job title with
16       that employer?
17            A    Field Office Manager and Executive Assistant.
18            Q    All right.  Throughout this deposition, just to
19       kind of lay some of the ground rules, I may refer to
20       Total Electrical Service & Supply company as TESSCO, for
21       ease of reference; is that understood?
22            A    Yes.
23            Q    Power Line Services will simply be Power Line?
24            A    Okay.
25            Q    I will also refer to most people on a first
```





1    Q    (BY MR. PARZIVAND)  What -- if you go down and

2    look under, "Duties," the third line is, "Process

3    Tuesday packets as they come in every week."  What are

4    Tuesday packets?

5    A    Since I'm not out in the field like the field

6    secretaries are, I pick up the slack for the crews that

7    don't have secretaries with them, so they send their

8    packets in to me, all their paperwork in to me every

9    Tuesday and so that's why it's called a Tuesday packet.

10   Q    What's -- what's encompassed in that packet?

11   Does it include expense reports?  What, exactly?

12   A    Yes, it includes expense reports, IVDR's,

13   vehicle inspection reports, fuel receipts, credit card

14   receipts, any employee paperwork that they may have,

15   their inventories once a month, their safety paperwork,

16   driver logs if they have truckers on their jobs, you

17   know.

18   Q    What is an IBDR?

19   A    Individual Vehicle Distance Record.

20   Q    Oh, I-V.  And in terms of processing these

21   packets, what does that entail, just making sure all

22   the -- is that just making sure all the paperwork is in

23   order or is there more to that?

24   A    I first check it all off and make sure it's all

25   there and then I make sure it was filled out correctly.



Case 4:12-cv-00509  Document 37-1  Filed on 08/02/12 in TXSD  Page 5 of 96

1    And I make copies.  And I log in the mileage from the

2    IVDR's.  And I check to see if there is any complaints

3    or anything wrong on the vehicle inspection reports and

4    turn in work orders for them if there are.  And then I

5    send the paperwork to the correct people.  And if they

6    are filled out incorrectly, I send them back to the

7    superintendents and ask for the correct information.

8        Q    If you'd go to the second page --

9        A    Uh-huh.

10       Q    -- you will see that the third duty is to take

11   applications, check them over, send information to April

12   for MVR background checks and set up drug screens.

13   What -- is that April Rosas that you're speaking of?

14       A    Yes.

15       Q    Okay.  And those are -- those are applications

16   for employment within the company?

17       A    Yes.

18       Q    Has the company been doing a lot of hiring over

19   the last few months?  Has the -- has the transmission

20   substation division grown?

21            MS. SAWYERS:  Objection, form.

22       A    Over the last few months, probably not.  I

23   mean, it's -- it goes up and down.  We go through a week

24   or two where they hire a lot of people and then it kind

25   of slows down and -- you know, as people leave or



1       Q     And was that a written policy?

2       A     Yes, it was.

3       Q     There is a part that I think definitely meshes

4   with your job and I was wondering if you could clarify

5   if this is the case.  If the -- if in -- go on to

6   Page 6.

7       A     Okay.

8       Q     The last sentence of kind of the incomplete

9   paragraph there.  "If the expense report is not received

10  by the Controller within a reasonable timeframe

11  thereafter, the charges will be deducted from the PLS

12  employee's pay until a properly submitted expense report

13  has been received."

14              Is that the policy at TESSCO?

15      A     Kind of.  There didn't have to be a properly

16  submitted expense report, but the receipts had to be

17  received.

18      Q     (BY MR. PARZIVAND)  Okay.  So if -- if Jerry,

19  for example -- scratch that.  If Jerry just forgets to

20  turn in a receipt for whatever reason, then that would

21  be deducted from his pay?

22              MS. SAWYERS:  Objection, form.

23      A     Not necessarily.  I would -- and Jerry could

24  tell you this -- I would pick up the phone and say,

25  "Jerry, I need your receipts."




1    Q    (BY MR. PARZIVAND)  Okay.

2    A    And then I would pick up the phone again and

3    say, "Jerry, did you ever find those receipts?"

4    Q    Okay.

5    A    And then I would pick up the phone and try to

6    call those companies and help him get copies of those

7    receipts.  And if all else failed, then they would be

8    deducted from his paycheck.

9    Q    Okay.

10   A    The reason being is we don't know what was

11   purchased.  We don't know if it was a personal purchase

12   or a company purchase, so if they are not keeping up

13   with their receipts, then it gets deducted.

14   Q    Okay.  And it -- it sounds like, based on what

15   you are telling me, though, it sounds like you were

16   making your best efforts to locate these receipts, even

17   if Jerry was unable to, that it was an automatic

18   deduction at that point?

19              MS. SAWYERS:  Objection, form.

20   A    It was not an automatic deduction, it was -- we

21   tried to find the receipts, yes.

22   Q    (BY MR. PARZIVAND)  Right, but if the receipts

23   were not located, if you couldn't locate them and Jerry

24   couldn't locate them, then his pay would eventually be

25   deducted automatically, essentially?



1       A    Yes.  Yes.

2       Q    Okay.  Let's go ahead to Page 9 and let me --

3   let me read that.  And again, I think this meshes with

4   everything else.

5            It's Section H:  "If the card is used for

6   an employee's personal expenses, PLS reserves the right

7   to recover these monies from the cardholder.  I'm

8   authorizing the company to recover from my salary any

9   amount charged to the PLS corporate credit card for

10  personal use."

11           Is that in line with TESSCO policy prior

12  to Power Line?

13      A    Yes.

14      Q    Is that in line with Power Line's current

15  policy?

16      A    Yes.

17                MR. PARZIVAND:  Let me know if at any

18  point you do need a break.  I'm going to -- would now be

19  a good time, or I can continue on?

20                MS. SAWYERS:  No, we're fine with a break

21  now.

22                MR. PARZIVAND:  Fine with a break now?

23                MS. SAWYERS:  Yeah.

24                THE VIDEOGRAPHER:  We're off the record at

25  2:40.  End of tape one.





```
 1                    (A break was taken from 2:40 to 2:53.)
 2                    THE VIDEOGRAPHER:  We're on the record at
 3     2:53.  Beginning of tape two.
 4        Q    (BY MR. PARZIVAND)  All right.  Have you ever
 5     met Norman Jarrett?
 6        A    Yes.
 7        Q    About how many -- how many times have you met
 8     him during your employment with TESSCO?
 9                    MS. SAWYERS:  Objection, form.
10        A    I talk to him every day when --
11        Q    (BY MR. PARZIVAND)  Well --
12        A    When he was employed with us, I talked to him
13     every day.
14        Q    For -- for what job duty or what reason?
15        A    He called in his time to me and he turned in
16     his Tuesday packets to me, just like Jerry Thurmon did.
17        Q    How often was Norman actually in Alvarado?
18        A    Most of the time.  Several times a week, when
19     he wasn't on the road.
20        Q    Did you ever speak to Norman regarding his
21     hernia that caused him to take off of work starting on
22     June 30th?
23        A    Yes.
24                    MS. SAWYERS:  Objection, form.
25        A    Yes.
```



1 purchased by the employee, as were the bigger tools or

2 the odd-sized tools were paid for by the company. But

3 by the descriptions on these receipts, I really couldn't

4 tell what they were and that's why I had to ask Wayland

5 or Armando.

6 Q And is it -- is it the superintendents who are

7 buying the tools or is it just the general electricians

8 and things like -- people like that who were buying

9 these tools?

10 A The superintendents had the credit cards.

11 Q Okay.

12 A Now, sometimes they may have given their credit

13 cards to one of their crew members to go purchase

14 something, but ultimately the superintendent was

15 responsible for what was purchased on his credit card.

16 Q So ultimately the superintendent, if -- if a --

17 if a non-approved tool was purchased, ultimately the

18 superintendent would be automatically deducted for the

19 purchase of that tool without approval?

20 MS. SAWYERS: Objection, form.

21 A Yes, it would be up to him to go to the crew

22 member who did that and deduct that from his paycheck.

23 Q (BY MR. PARZIVAND) So would that be an

24 informal deduction or would it be basically the

25 superintendent goes and, you know, gets a check from

Charlotte Smith Reporting, Inc.
Questions? depos@simplecharlotte.com




```
 1    that crew member?

 2         A    No, it would be a payroll deduction.

 3         Q    Okay.  So --

 4         A    Yeah.

 5         Q    So he would actually go through and call you or

 6    Monica Abila or whoever is in charge of payroll

 7    deductions and say, "This deduction isn't mine, transfer

 8    it to 'X' employee," essentially?

 9         A    Correct, correct.

10         Q    Okay.  Is it -- would it be Monica Abila would

11    be the person they would call or would it be you?

12         A    Me.

13         Q    It would be you?

14         A    Me.

15         Q    Have you ever met Brett Jarrett?

16         A    Yes.

17         Q    About how many times have you met him during

18    the course of your employment?

19         A    Five to ten, somewhere in there.

20         Q    Do you think you would recognize him if he was

21    in this room today?

22         A    Yes.  He looks just like his dad.

23         Q    How about Armando, do you talk to him about as

24    frequently as Wayland?

25         A    Yes.
```



Page 45

```
 1      Q    When was the last time you spoke to Norman
 2  Jarrett, that you remember?
 3      A    I believe it was in August when I called him to
 4  tell him I was sending home FMLA paperwork.
 5      Q    How were you sending that FMLA paperwork, by
 6  mail or --
 7      A    With his son.
 8      Q    Did you try to send it any other way?
 9      A    No.  Norman told me to send it with his son.
10      Q    Let's talk a little bit about Darrell.
11  What's -- what's Mr. Hallmark's current position in the
12  company?
13      A    Senior Vice-President.
14      Q    Of?
15      A    Transmission Substation and Distribution.
16  Well, we also call that TUS, which is TESSCO Utility
17  Services.
18      Q    What's -- what's the level of upper managers
19  below him?  Are there two vice-presidents, one of
20  transmission, one of substation?
21      A    Now there is a Vice-President of Substation,
22  which is Fred Guerrero.  And now there is a
23  Vice-President of Estimating, which I believe is Philip
24  El Turk.  And I believe there's also vice-presidents in
25  other divisions.
```



1     Q    So it would have been -- would it have been

2  after he was terminated, then?  I mean --

3     A    I don't remember if he was terminated or just

4  was out because of his injury, but he wasn't at work.

5     Q    Okay.

6     A    Yeah.

7     Q    So I'm guessing you -- you would have called

8  him about his -- his jury happened on July 29th.  I'll

9  represent that to you.  And I'm guessing you would have

10  been calling about the credit card statement that came

11  to you on July 26th.

12          MS. SAWYERS:  Objection, form.

13     A    Probably.  We had until the 10th to get it

14  done, so it was probably between the 29th and the 10th.

15     Q    (BY MR. PARZIVAND)  Okay.  Can you kind of give

16  me the general -- the general feel for how a termination

17  is processed at TESSCO?

18          MS. SAWYERS:  Objection, form.

19     A    Well, the supervisor will either do it himself

20  or he will call me and say, "Type up a termination.

21  This is what I want you to say."

22          And then I ask, "Well, what was his last

23  day worked," because while Sharon was there, the

24  termination date was the last day worked, not

25  necessarily the date that they made the decision to



```
 1    terminate.  And I'd say, "What was the last day worked
 2    and is he eligible for rehire?"
 3                And then we would find out if they had
 4    turned in their uniforms, their credit cards, their fuel
 5    cards, their phones and their computers, if they had
 6    them -- if they were issued them.  And if they had not,
 7    we would do a payroll deduction.  And then we would also
 8    find out if there was any charges on their credit card
 9    and try to find the receipts for them and if we
10    couldn't, then do a payroll deduction to try to get
11    those in before their last paycheck, in case they didn't
12    return company property to us.
13                And then I would send them to Sharon and I
14    would cc Darrell on it and the general superintendent in
15    charge and Sheila Hicks and Monica and Amy -- Monica
16    Abila and Amy Beck.  And then later it was Jeff Bass and
17    April Rosas we send them to now.
18    Q    (BY MR. PARZIVAND)  Who is Amy Beck?
19    A    She worked with Monica in payroll.
20    Q    Is she still working for the company?
21    A    No, her and Monica left the same day.
22    Q    Is there a back story there?
23                MS. SAWYERS:  Objection, form.
24    A    When PLS took over, they decided that the
25    Midland office would be closed and they would start an
```



```
 1                 MR. PARZIVAND:  I got you.
 2                 Let's go ahead and mark --
 3       A     And then -- oh, I'm sorry.
 4       Q     (BY MR. PARZIVAND)  Go ahead.
 5       A     Then we thought we were going to have to pay
 6   more, because the ticket looked like he got a ticket for
 7   speeding.  And I was just telling him that he was --
 8   that it wasn't for speeding, all that we had to pay for
 9   was the DOT inspection and that Mondo was going to try
10   to get that dismissed.  So in other words, Jerry didn't
11   owe us any more money for that.
12       Q     Got you.
13       A     Okay.
14       Q     And you run -- whenever -- whenever there is a
15   deduction for lost receipts, you run that by April Rosas
16   every -- every time, huh?
17                 MS. SAWYERS:  Objection, form.
18       A     We do now.  That's a new policy.
19       Q     (BY MR. PARZIVAND)  Okay.  So since -- since
20   about January when you started talking to April Rosas
21   regularly or is it a more recent phenomenon?
22       A     No, more recent.
23       Q     Okay.
24       A     I used to just run it by Darrell.
25       Q     Okay.
```



1          A      I run it by their immediate supervisor, which
2     in Jerry's case would have been Wayland or Mondo, and
3     then I run it by Darrell.
4          Q      Okay. So since April is onboard, it's safe to
5     say that Sun Electric has similar policies on lost
6     receipts?
7                 MS. SAWYERS: Objection, form.
8          A      Yes. It's in that expense policy.
9                 (Payne Exhibit Number 31 was marked.)
10         Q      (BY MR. PARZIVAND) Okay. Let's go ahead and
11    take a look at Exhibit Number 31, just recently marked.
12    This seems to be a deduction on a Power Line Services
13    payroll deduction form for Jerry's uniform. Looks like
14    it was dated -- or at least e-mailed on August 17th,
15    dated August 16th. It's normal policy for y'all to
16    deduct for non -- unreturned uniforms?
17                MS. SAWYERS: Objection --
18         Q      (BY MR. PARZIVAND) -- is that correct?
19                MS. SAWYERS: I'm sorry. Objection, form.
20         A      Yes, that's correct.
21         Q      (BY MR. PARZIVAND) How much time, about, do
22    they -- do employees get to return the uniform before
23    you guys do a deduction?
24         A      We want them back before payroll goes in,
25    because they get their last paycheck and then there is



```
 1         Q     (BY MR. PARZIVAND)   Here you've got a small
 2    amount, it's just a receipt from it seems like a
 3    convenience store.  And receipt got lost and obviously
 4    neither you nor -- nor Jerry could locate it and
 5    therefore it seems like a deduction took place; is that
 6    correct?
 7         A     Correct.
 8               MR. PARZIVAND:   This one is a little bit
 9    unusual.  I'll go ahead and mark it Exhibit Number 34.
10               (Payne Exhibit Number 34 was marked.)
11         A     Oh, yeah.
12         Q     (BY MR. PARZIVAND)   Do you remember -- do you
13    remember this deduction?
14         A     Yes, I do now.
15         Q     What -- what exactly happened to cost Jerry
16    $2,500?
17               MS. SAWYERS:   Objection, form.
18         A     Jerry backed into a car in the RV parking lot,
19    if I remember correctly, and Jerry was on our no drive
20    list, which means he was not covered by our insurance
21    and was not supposed to be driving a company truck.  And
22    so I guess Mondo made him pay for part of it -- part of
23    the damages.
24         Q     (BY MR. PARZIVAND)   So and it was -- it was
25    based on the damages, was the reason for the deduction?
```



1      A      Correct.

2      Q      Okay.  Well, is it -- is it common for people

3   to have to pay for their damages to equipment at TESSCO

4   or Power Line?

5            MS. SAWYERS:  Objection, form.

6      A      No, it's not common.  I mean, people that

7   are -- that are on our good driving list are insured by

8   our company and therefore our insurance covers it.

9      Q      (BY MR. PARZIVAND)  Do you remember an instance

10  where Norman had to pay for damage to a vehicle too?

11           MS. SAWYERS:  Objection, form.

12     A      I think I remember something like that.  And I

13  think that Norman had to pay for it, because it was -- I

14  think, if I remember correctly, that's the other one he

15  lied about.  And he only had -- he only had to pay a

16  portion of it, though.  I don't think he had to pay it

17  all, if I remember correctly.  And I think they did that

18  because that was like his seventh or eighth accident and

19  that was -- I'm trying to remember the circumstances.

20           I think Norman had claimed it against his

21  own insurance and saying it was his personal car.  And

22  it turned out it was he was really in a company truck

23  and he had taken a company truck home, which was against

24  the rules.  And he tried to cover it up and so because

25  of all the money he cost the company because of lying



1   about it and trying to cover it up, then Wayland made

2   him pay for the portion -- somehow he came up with a

3   portion of what was Norman's responsibility for all of

4   that, so.

5       Q   (BY MR. PARZIVAND)  Okay.

6       A   If -- if I remember -- if that's the one I'm

7   thinking of.

8           MR. PARZIVAND:  Let me go ahead and mark

9   Exhibit Number 35.

10          THE WITNESS:  Oh, I thought we were

11  through with all the exhibits.

12          MR. PARZIVAND:  I'm trying to send a

13  barrage over.

14          (Payne Exhibit Number 35 was marked.)

15      Q   (BY MR. PARZIVAND)  Do you recognize this

16  document at all?

17      A   TESSCO had my permission to withdraw needed

18  amounts from my paycheck to cover any and all

19  outstanding personal charges, which may include any

20  current charges that I may have incurred from uniform

21  rental..."

22          No, I do not.

23      Q   I was just curious if y'all have ever applied

24  the 15 percent charge --

25      A   Oh, yes, I do.  This is part of the -- our old



1            MS. SAWYERS:  Objection, form.

2        A    No, because as soon as he was to turn in the

3    receipts, he would get the money back.  I mean, and he

4    knew from -- from day -- from the day he got a company

5    credit card that he was responsible for that card and he

6    was responsible to turn in those receipts.

7        Q    (BY MR. PARZIVAND)  Wasn't -- wasn't TESSCO at

8    that point on August 4th, 2010, under the understanding

9    that this is an injured guy who's -- who is a lot more

10   worried about his health than anything else?

11           MS. SAWYERS:  Objection, form.

12       A    I'm sure they understood that, but, again, this

13   is company policy across the board.  And as soon as some

14   of those receipts were found, the payroll deduction, it

15   was my understanding, was reversed from whatever they

16   found in his truck.  But TESSCO does that to cover -- to

17   cover themselves, because they lose so much money from

18   people not turning things in when they leave.

19       Q    (BY MR. PARZIVAND)  So your point here is this

20   wasn't -- this wasn't -- this wasn't personal, you know,

21   this was just an automatic deduction?

22           MS. SAWYERS:  Objection, form.

23       A    That's correct.

24       Q    (BY MR. PARZIVAND)  Okay.  And -- and this --

25   this would be the same policy that would apply across




```
 1   the board at all Power Line companies, at Sun Electric,
 2   at Auger, everything?
 3                 MS. SAWYERS:  Objection, form.
 4        A    That's correct.
 5                 MR. PARZIVAND:  We've gone an hour.  Let
 6   me take a small break, re-situate myself and try to
 7   figure out what -- what I can take care of by the end of
 8   the day.
 9                 MS. SAWYERS:  Okay.
10                 MR. PARZIVAND:  I don't think I'm going to
11   be able to take care of the whole thing.
12                 MS. SAWYERS:  Okay.
13                 MR. PARZIVAND:  It's 5:04.
14                 THE VIDEOGRAPHER:  Okay.  Off the record
15   at 5:08.  End of tape three.
16                 (A break was taken from 5:08 to 5:18.)
17                 THE VIDEOGRAPHER:  We're on the record at
18   5:18.  Beginning of tape four.
19                 MR. PARZIVAND:  All right.  I've got
20   another exhibit for you, Exhibit Number 37.  And I'll go
21   ahead and mark it right here.
22                 (Payne Exhibit Number 37 was marked.)
23        Q    (BY MR. PARZIVAND)  Do you remember your
24   conversation with Aranda Manuel, the insurance claims
25   adjuster from Liberty Mutual regarding -- regarding
```

```
 1                        NO. 10-12-13331

 2     NORMAN JARRETT and            § IN THE DISTRICT COURT OF
       JERRY THURMON                 §
 3                                   §
       VS.                           §
                                     § MONTGOMERY COUNTY, TEXAS
 4                                   §
       POWER LINE SERVICES, INC.     §
 5     and TOTAL ELECTRICAL          §
       SERVICE & SUPPLY CO.          § 284TH JUDICIAL DISTRICT
 6

 7                    REPORTER'S CERTIFICATION

 8                    DEPOSITION OF SHARI PAYNE

 9                         APRIL 1, 2011

10           I, Linda Rayburn, Certified Shorthand Reporter

11     in and for the State of Texas, hereby certify to the

12     following:

13           That the witness, SHARI PAYNE, was duly sworn

14     by the officer and that the transcript of the oral

15     deposition is a true record of the testimony given by

16     the witness;

17           That the deposition transcript was submitted on

18     April 15, 2011         to the witness or to

19     the attorney for the witness for examination, signature

20     and return to me by  May 5, 2011        ;

21           That the amount of time used by each party at

22     the deposition is as follows:

23           HESSAM PARZIVAND   -    3 hours and 12 minutes

24           That pursuant to information given to the

25     deposition officer at the time said testimony was taken,
```

1   the following includes counsel for all parties of

2   record:

3         HESSAM PARZIVAND, Attorney for Plaintiffs

4         HOLLIE SAWYERS, Attorney for Defendants

5         I further certify that I am neither counsel

6   for, related to, nor employed by any of the parties or

7   attorneys in the action in which this proceeding was

8   taken, and further that I am not financially or

9   otherwise interested in the outcome of the action.

10        Further certification requirements pursuant to

11  Rule 203 of TRCP will be certified to after they have

12  occurred.

13        Certified to by me this  /5ᵗʰ  day

14  April       , 2011.

15

16

17                          Linda Rayburn
                            LINDA RAYBURN
18                          Texas CSR 2965
                            Expiration Date:   12-31-12
19
                            Charlotte Smith Reporting, Inc.
20                          Firm Registration No. 361
                            1116 Naylor, Suite C
21                          Houston, Texas 77002
                            (713) 523-5400
22

23

24

25

Page 137

```
1            FURTHER CERTIFICATION UNDER RULE 203 TRCP

2            The original deposition was/was not returned to

3    the deposition officer on  May 5, 2011;

4            If returned, the attached Changes and Signature

5    page contains any changes and the reasons therefor;

6            If returned, the original deposition was

7    delivered to  Hessam Parzuan           ,

8    Custodial Attorney;

9            That $ 906.05    is the deposition officer's

10   charges to the  Plaintiff

11   for preparing the original deposition transcript and any

12   copies of exhibits;

13           That the deposition was delivered in accordance

14   with Rule 203.3, and that a copy of this certificate was

15   served on all parties shown herein on

16    August 1, 2011     and filed with the Clerk.

17           Certified to by me this  1st  day of

18    August , 2011.

19

20

21                              _____
                                LINDA RAYBURN
22                              Texas CSR 2965
                                Expiration Date:  12-31-12
23
                                Charlotte Smith Reporting, Inc.
24                              Firm Registration No. 361
                                1116 Naylor, Suite C
25                              Houston, Texas 77002
                                (713) 523-5400
```

# EXHIBIT

# 2




CAUSE NO. 10-12-13331

| NORMAN JARRETT and | ) | IN THE DISTRICT COURT |
|---|---|---|
| JERRY THURMON | ) | |
| | ) | |
| | ) | |
| VS. | ) | MONTGOMERY COUNTY, TEXAS |
| | ) | |
| POWER LINE SERVICES, INC., | ) | |
| and TOTAL ELECTRICAL | ) | |
| SERVICE & SUPPLY COMPANY | ) | 284TH JUDICIAL DISTRICT |

**************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

ARMANDO RENTERIA

April 8, 2011

**************************************************************

ORAL AND VIDEOTAPED DEPOSITION OF ARMANDO RENTERIA,

produced as a witness at the instance of the PLAINTIFFS,

and duly sworn, was taken in the above-styled and

numbered cause on the 8th of April, 2011, from 9:14 a.m.

to 3:25 p.m., before David S. Smith, RPR, CSR in and for

the State of Texas, reported by machine shorthand, at the

offices of Stuart & Associates, P.C.; 909 Fannin Street,

Suite 3250; Houston, Texas, pursuant to the Texas Rules

of Civil Procedure and any provisions stated on the

record or attached hereto.



```
1                    P R O C E E D I N G S

2                    THE VIDEOGRAPHER:  We are on the record.

3    It is Friday, April 8th, 2011.  It is 9:14 a.m.  This is

4    the beginning of Tape 1.

5                    Will counsel introduce themselves and

6    state whom they represent.

7                    MS. WALTER:  April Walter representing

8    Plaintiffs Norman Jarrett and Jerry Thurmon.

9                    MS. SAWYERS:  Hollie Sawyers representing

10   Defendant Power Line Services and Total Electric

11   Service & Supply Company.

12                   THE VIDEOGRAPHER:  Will the Court

13   Reporter please swear in the Witness.

14                   ARMANDO RENTERIA,

15   having been first duly sworn, testified as follows:

16                        EXAMINATION

17   BY MS. WALTER:

18        Q    Please state your full name for the ladies and

19   gentlemen of the jury.

20        A    My name is Armando Renteria.

21        Q    Do you also go by "Mando" for short?

22        A    Yes, ma'am.

23        Q    Who is your current employer?

24        A    TESSCO Utilities.

25        Q    What is your present job title at TESSCO?
```



```
 1       A     I'm a general superintendent in substations.

 2       Q     Do you have an office at TESSCO?

 3       A     No, ma'am.  I work out of my pickup.  We're

 4   stationed out of Midland, Texas.

 5       Q     Throughout your deposition, I will refer to

 6   Total Electrical Service & Supply Company as simply

 7   "TESSCO" for ease of reference.

 8             Do you understand that, sir?

 9       A     Yes, I do.

10       Q     And, likewise, throughout your deposition, I

11   will refer to Power Line Services, Inc., as simply

12   "Power Line" or "PLS" for short.

13             Do you understand that?

14       A     Yes, ma'am.

15       Q     Do you understand that we are here to take

16   your deposition in connection with a lawsuit that was

17   filed in State court against Power Line and TESSCO by

18   Norman Jarrett and Jerry Thurmon?

19       A     Yes, ma'am.

20       Q     How did you first learn about this lawsuit?

21       A     How?

22       Q     Yes.

23       A     It was just a phone call from Nicole.

24       Q     Is that Nicole Vann?

25       A     Yes, ma'am.
```



```
 1                    THE VIDEOGRAPHER:  We are back on the
 2    record.  It is 2:24 p.m.  This is the beginning of
 3    Tape 4.
 4        Q    (BY MS. WALTER) I'm going to show you what
 5    I've marked as Exhibit 79, a copy of your business card,
 6    sir.
 7        A    (Reviewing document) Gosh!  Where did you get
 8    this?
 9        Q    I got this from the Defendants' counsel.  Is
10    this an old card?
11        A    No, it's current.
12        Q    Have you gotten any new cards since Power Line
13    took over TESSCO?
14                  MS. SAWYERS:  Objection, form.
15        A    This is who I work for - TESSCO.
16        Q    Okay.  My question is:  Have you gotten any
17    new business cards since Power Line took over?
18                  MS. SAWYERS:  Objection, form.
19        A    No.
20        Q    No?
21             If you could look at premarked Exhibit 32, it
22    is a payroll deduction form, if that helps spot it.
23        A    (Reviewing documents) Getting there.  I'm
24    getting to where I can find them.
25        Q    Exhibit 32 - is that your signature under the
```




 1    general superintendent/superintendent signature?

 2         A    Yes, it is.

 3         Q    Okay.  Is this a form that you filled out for

 4    Mr. Thurmon, to your knowledge?

 5         A    Yes, it is.

 6         Q    And the description of the payroll deduction

 7    says:  "Nokia 6086 cell phone (Sam Gomez's phone)."

 8              Do you see that?

 9         A    Yes.

10         Q    Who is Sam Gomez?

11         A    At that time he was his foreman.

12         Q    He was Mr. Thurmon's foreman?

13         A    Yes, at one time.  At this particular time.

14         Q    Okay.  And why was Mr. Thurmon getting a

15    payroll deduction for Sam Gomez's phone?

16         A    Because it was off of his credit card.

17         Q    Off of whose's credit card?

18         A    Jerry Thurmon's company credit card.

19         Q    Okay.  So, he had purchased Sam --

20         A    He had purchased that without authorization,

21    yes.

22         Q    Purchased a cell phone for Mr. Gomez?

23         A    I don't believe that was a cell phone.

24         Q    Okay.

25         A    It was, like, an accessory which I think it



Page 186

1    was a cord or something of that nature; but it wasn't a

2    cell phone.  I'd buy a bunch of them for $10.

3         Q    That's what that was?

4         A    That's what that was.

5         Q    Okay.  And was there a deduction made to

6    Mr. Gomez's pay, as well?

7         A    No.

8         Q    Why was the deduction made to Mr. Thurmon's

9    pay?

10             MS. SAWYERS:  Objection, form.

11        A    Because it was his credit card and his

12   responsibility and his place to get authorization.

13        Q    And was that --

14        A    He authorized him to buy it, but he wasn't

15   authorized to purchase it.

16        Q    Okay.  I see.

17             And was that pursuant to company policy

18   related to payroll deductions?

19        A    Pretty well.  We're pretty strong on that.

20        Q    What was that?

21        A    We're pretty strong on that.

22        Q    We're pretty what?  I'm sorry.

23        A    We're pretty on that when it's not authorized

24   by us.

25        Q    What are you strong on, sir?



```
 1        A      On deducting something off their paycheck when
 2   they are not authorized to buy it.
 3        Q      And is that also true that they might be
 4   authorized to buy something, but they can't present a
 5   receipt for it?
 6        A      Pretty well.
 7        Q      Are they strong on that deduction, as well?
 8        A      Very strong.
 9        Q      And who does that apply to?  Is it just the
10   superintendents?
11               MS. SAWYERS:  Objection, form.
12        A      Well, no.  Everybody.  Everybody who has got a
13   credit card.
14        Q      Everybody who has a credit card?
15        A      Yes, ma'am.
16        Q      I'm going to play a tape or a disk for you in
17   a moment.  And all I want you to do is listen to the
18   voices on the tape.  And my question to you after we
19   play the tape will be:  Do you recognize your voice on
20   it?
21               (REPORTER'S NOTE:  AN AUDIO RECORDING WAS
22   PLAYED.)
23        Q      (BY MS. WALTER) Did you recognize your voice?
24        A      That's my voice.
25        Q      Did you have that telephone call with --
```

Page 227

1                    CAUSE NO. 10-12-13331

2   NORMAN JARRETT and          )  IN THE DISTRICT COURT
    JERRY THURMON               )
3                               )
                                )
4   VS.                         )  MONTGOMERY COUNTY,
                                )  TEXAS
5   POWER LINE SERVICES,        )
    INC., and TOTAL             )
6   ELECTRICAL SERVICE &        )
    SUPPLY COMPANY                 284TH JUDICIAL DISTRICT
7

8               REPORTER'S CERTIFICATION
              DEPOSITION OF ARMANDO RENTERIA
9                     April 8, 2011

10       I, David S. Smith, RPR, Certified Shorthand Reporter

11  in and for the State of Texas, hereby certify to the

12  following:

13       That the witness, ARMANDO RENTERIA, was duly sworn

14  by the officer and that the transcript of the oral

15  deposition is a true record of the testimony given by

16  the witness;

17       That the deposition transcript was submitted on

18  _May  16_____, 2011, to the witness or to the

19  attorney for the witness for examination, signature and

20  return to me by  _June 06_, 2011;

21       That the amount of time used by each party at the

22  deposition is as follows:

23  Ms. Walter.....3 HOURS:33 MINUTES

24  Ms. Sawyers.....No time used

25       That pursuant to information given to the deposition

Page 228

1    officer at the time said testimony was taken, the

2    following includes counsel for all parties of record:

3    FOR THE PLAINTIFF:
         Ms. April L. Walter

4

     FOR THE DEFENDANT:
5        Ms. Hollie L. Sawyers

6         I further certify that I am neither counsel for,

7    related to, nor employed by any of the parties or

8    attorneys in the action in which this proceeding was

9    taken, and further that I am not financially or

10   otherwise interested in the outcome of the action.

11        Further certification requirements pursuant to Rule

12   203 of TRCP will be certified to after they have

13   occurred.

14        Certified to by me this _16th_ of _May_,

15   2011.

16

17

18        _David S. Smith_
          David S. Smith, CSR, RPR
19        Texas CSR No. 4166
          Expiration Date:  12/31/12
20        Charlotte Smith Reporting, Inc.
          1116 Naylor Street, Suite C
21        Houston, Texas   77002
          DSMITH@SIMPLECHARLOTTE.COM
22        713.523.5400

23

24

25

Page 231

1         FURTHER CERTIFICATION UNDER RULE 203 TRCP

2         The original deposition was/was not returned to the

3    deposition officer on _June 06, 2011_;

4         If returned, the attached Changes and Signature page

5    contains any changes and the reasons therefor;

6         If returned, the original deposition was delivered

7    to _April Walter_, Custodial Attorney;

8         That $1,443.95 is the deposition officer's charge

9    to the Plaintiffs for preparing the original deposition

10   transcript and any copies of exhibits;

11        That the deposition was delivered in accordance with

12   Rule 203.3, and that a copy of this certificate was

13   served on all parties shown herein on and filed with the

14   Clerk.

15        Certified to by me this        9th        day of

16   _August_        , 2011.

17

18                    _David S. Smith_
                      David S. Smith, CSR, RPR
19                    Texas CSR No. 4166
                      Expiration Date:  12/31/12
20                    Charlotte Smith Reporting, Inc.
                      Firm I.D. No. 361
21                    1116 Naylor Street, Suite C
                      Houston, Texas   77002
22                    DSMITH@SIMPLECHARLOTTE.COM
                      713.523.5400

23

24

25

867da7d5-11cb-4b1e-993c-4dcac57f935e

# EXHIBIT

# 3




IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JERRY THURMON, WAYNE THURMON, and OTHERS SIMILARLY SITUATED, | ) CIVIL ACTION<br>) NO.: 4:11-cv-01365<br>) |
| Plaintiffs, | )<br>) |
| VS.: | ) COLLECTIVE ACTION<br>) REQUESTED |
| POWER LINE SERVCIES, INC.; TOTAL ELECTRICAL SERVICE & SUPPLY CO.; and SUN ELECTRIC SERVICES, INC., | )<br>)<br>)<br>)<br>) |
| Defendants. | ) JURY TRIAL DEMANDED |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

FREDERICK C. WASSON

March 7, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

FREDERICK C. WASSON, produced as a witness at the

instance of the PLAINTIFFS, and duly sworn, was taken in

the above-styled and numbered cause on the 7th of March,

2012, from 9:03 a.m. to 3:11 p.m., before David S. Smith,

RPR, CSR in and for the State of Texas, reported by

machine shorthand, at the offices of Stuart & Associates;

909 Fannin Street, Suite 3250; Houston, Texas, pursuant

to the Texas Rules of Civil Procedure and any provisions

stated on the record or attached hereto.



1     Q    And who is your current employer?

2     A    Power Line Services.

3     Q    Is that Power Line Services, Inc.?

4     A    Yes.

5     Q    When did you first start working for Power

6  Line Services, Inc.?

7     A    July of 2010.

8     Q    So, you've been working for Power Line for

9  just under two years?

10    A    Yes.

11    Q    What is your current job title at Power Line

12 Services?

13    A    Controller.

14    Q    Have you held any other job titles at Power

15 Line Services other than controller?

16    A    No.

17    Q    Who is your direct supervisor at Power Line

18 Services?

19    A    Ken Dodgen.

20    Q    And what is Mr. Dodgen's position at Power

21 Line Services?

22    A    Chief financial officer.

23    Q    Have you had any other direct supervisors

24 besides Mr. Dodgen during your tenure at Power Line

25 Services?



1    Q    Have you always officed at that address during

2    your tenure with Power Line Services?

3         A    No.

4         Q    What other office have you had?

5         A    When I first started, we were on the fourth

6    floor.

7         Q    Same building, though?

8         A    Uh-huh.

9         Q    Is that a "yes"?

10        A    Yes.

11        Q    Does Power Line Services still occupy any

12   space on the fourth floor, or have they completely moved

13   floors?

14        A    Completely moved.

15        Q    Do you have any direct reports under you?

16        A    Yes.

17        Q    How many direct reports do you have?

18        A    Five.

19        Q    What positions are the persons that report to

20   you?

21        A    Assistant controller, finance manager, payroll

22   manager, and two senior accountants.

23        Q    What are your principal job duties as

24   controller for Power Line Services?

25        A    Primarily responsible for financial



```
 1    statements, transactions.  I have accounts payable and

 2    payroll report to me.  I also have operational

 3    accounting projects, just costing review.

 4         Q    Is that the costing of a particular job?

 5         A    Of the various jobs, yes.

 6         Q    Okay.

 7         A    The -- Also some credit review, credit for

 8    customers, and so on.

 9         Q    Anything else that you can think of as a major

10    job function that you do as the controller?

11         A    Currently the -- I have a person that is

12    responsible for system support for our ERP system.

13         Q    Is that kind of an IT function?

14         A    We're actually moving it to IT.

15         Q    Okay.  But right now, it's under you?

16         A    Correct.

17         Q    And the ERP is like your customer management

18    software?

19         A    It's the financial system.

20         Q    The financial system?  Okay.

21         A    Uh-huh.

22         Q    Now, do you also hold the title of controller

23    for Total Electrical Service & Supply Company?

24         A    I'm the controller for the corporate.  I don't

25    have a title specific to any of the subsidiaries that we
```




1  have at all; so, just controller for the overall entity.

2      Q    Okay.  Does Total Electrical Service & Supply

3  Company have a separate controller of its own?

4      A    No.

5      Q    And does Sun Electric Services, Inc., have a

6  separate controller of its own?

7      A    No.

8      Q    Does Air2, L.L.C., have a separate controller

9  of its own?

10      A    No.

11      Q    Do you perform those major job functions for

12  Total Electrical Service & Supply Company, as well?

13      A    Yes.

14      Q    And for the positions that report to you,

15  like, for example, start with the assistant controller

16  position, does that person act as assistant controller

17  for all of the subsidiaries, as well?

18      A    Yes.

19      Q    So, there's no separate assistant controller

20  under any of the subdivisions?

21      A    No.

22      Q    And the same for the finance manager.  Does

23  that person perform his or her job functions for all of

24  the subsidiaries under Power Line Services?

25      A    Yes.




1    A    No.

2    Q    To prepare for your deposition, did Ms. Rosas

3    provide you with any documents?

4    A    No.

5    Q    What is Ms. Rosas' current job title at Power

6    Line Services, Inc.?

7    A    I believe it's HR manager.

8    Q    And has Ms. Rosas always been the HR manager

9    during your tenure with Power Line Services?

10   A    She has been an HR manager, yes.

11   Q    What do you mean by that distinction?

12   A    When I was hired, she was HR manager for Sun

13   Electric.

14   Q    To your knowledge, when did she become HR

15   manager for Power Line Services?

16   A    Currently, she's HR manager for the Energy

17   Services group, which is primarily TESSCO.

18   Q    When did she become the HR manager for the

19   Energy Services group that is primarily TESSCO?

20   A    The fall of 2011.

21   Q    Okay.  Did you have any discussions with

22   Armando Renteria to prepare for your deposition today?

23   A    Yes.

24   Q    Did you meet in person with Mr. Renteria, or

25   did you do this over the phone?



```
 1        A     Over the phone.

 2        Q     How many discussions did you have with

 3   Mr. Renteria?

 4        A     One.

 5        Q     When was that?

 6        A     Monday, this week.

 7        Q     Did anyone else participate in that call?

 8        A     No.

 9        Q     About how long did you speak with

10   Mr. Renteria?

11        A     15 minutes, maybe.

12        Q     Can you tell me in as great a detail as you

13   can recall what you and Mr. Renteria discussed in that

14   15-minute call?

15        A     Talked about the job duties for a

16   superintendent.

17        Q     What did Mr. Renteria tell you the principal

18   job duties were for a superintendent?

19        A     Principal job duties were supervising the crew

20   that he's responsible for; preparing the project

21   reports, time sheets for the crew; hands-on position.

22   So, he might be there pulling wire and doing whatever

23   just like everybody else in the crew, which is a very

24   hands-on position.  And preparing -- Depending on the

25   project and the customer requirements, the associated
```





Page 36

1   paperwork.

2       Q    Did Mr. Renteria discuss with you that one of

3   the superintendent's job functions is to obtain material

4   for a job?

5       A    We didn't mention that, no.

6       Q    To your knowledge from any other sources, is

7   one of the job functions of a superintendent to obtain

8   materials for a jobsite?

9       A    I would -- They would -- It would not be

10  unusual for them to place an order for material, no.

11      Q    And do they also have occasion to go out and

12  purchase supplies and equipment from hardware stores and

13  other various suppliers while they are out in the field

14  for a jobsite?

15      A    They could, yes.

16      Q    And they are, in fact, issued corporate credit

17  cards for this purpose, correct?

18      A    Yes.

19      Q    Did Mr. Renteria discuss anything with you

20  with respect to how materials and equipment are obtained

21  for the jobsites the superintendents oversee?

22      A    No.

23      Q    With respect to preparing project reports,

24  what sorts of project reports is a superintendent

25  responsible for preparing?




```
 1        A     Just current status of the job, daily
 2   activities; so, kind of a log of what's going on, what's
 3   the status, problems they might run into.
 4        Q     Now, one of the responsibilities of a
 5   superintendent is to perform -- Strike that.
 6              One of the responsibilities of a
 7   superintendent is to complete a job in a cost-effective
 8   manner, correct?
 9        A     Correct.
10        Q     So, the superintendent is the man on the
11   ground in charge of trying to bring a job to completion
12   at an appropriate cost?
13        A     One of the people that's responsible for that,
14   yes.
15        Q     And the other persons being?
16        A     Project managers.
17        Q     And would the project managers be people like
18   Mr. Renteria above the superintendent?
19        A     Yes.
20        Q     When a job is -- Strike that.
21              Jobs are typically bid, correct?
22        A     Correct.
23        Q     And there are certain cost estimates that are
24   built into that bid, correct?
25        A     Yes.
```



1    Q    Is one of the principal job duties of a

2    superintendent to try to complete the job within those

3    parameters of the cost estimates that were built into

4    the bid?

5    A    Yes.

6    Q    And, ideally, maybe even come in a little

7    lower on the cost side, correct?

8                MS. REIMINGER:  Objection.  Calls for

9    speculation.

10    A    I would assume that, yes, as a company, as

11    managing any individual project, you would like to

12    perform a little better.

13    Q    Is that your belief based on your years of

14    experience as a controller?

15    A    Yes.

16    Q    And you mentioned that one of your principal

17    job duties was performing certain cost reviews; is that

18    correct?

19    A    Yes.

20    Q    And, so, you will review the costs that are

21    associated with particular jobs?

22    A    The senior accountants do that in detail, and

23    I oversee that.

24    Q    Besides these job functions that Mr. Renteria

25    discussed with you, as well as the addition of ordering



1    materials or supplies or purchasing equipment and

2    supplies in the field that you testified to, can you

3    think of any other principal job duties for a

4    superintendent?

5         A    The only one since you had mentioned it was,

6    of course, filling out and completing his expense report

7    if he's used his credit card.

8         Q    And, so, the proper -- I'm sorry.

9         A    No, that was basically what was said.

10        Q    Okay.  And, so, the proper filling out of an

11   expense report is one of the main functions for a

12   superintendent, as well?

13        A    Part of the requirements, yes, if they have a

14   company card.

15        Q    And is that a weekly requirement?

16        A    It's semiweekly.  Not semiweekly.

17   Semimonthly.

18        Q    Has it always been semimonthly?

19        A    No.

20        Q    Okay.  Previously, it was weekly, correct?

21        A    Previously, it was weekly.

22        Q    And previously, it had to be submitted on

23   Tuesdays, correct?

24        A    I don't recall the day specifically, but every

25   week.



1        Q        Had you ever heard of the term "Tuesday

2    packet"?

3        A        No.

4        Q        Were you aware of a process whereby the

5    superintendents would turn in their expense-related

6    documentation from the field to an office on Tuesdays?

7        A        I don't know about the days; but, yes, some

8    superintendents would turn in their receipts to a field

9    secretary or office.  And then they would ultimately

10   take those receipts to prepare the expense report.

11       Q        And when was the shift made from a weekly

12   reporting to a semimonthly reporting?

13       A        2011.  I don't remember exactly when we made

14   that change.

15       Q        You understand that superintendents are out in

16   the field?

17       A        Yes.

18       Q        And, so, they are assigned to jobsites all

19   over the state of Texas?

20       A        Yes.

21       Q        And they can even be assigned to jobsites all

22   over the Country, correct?

23       A        They could.

24       Q        So, typically, they are not reporting to a

25   fixed Power Line or TESSCO office, correct?



 1          A      They are reporting back to the project

 2    manager, wherever he may be, as a project manager may

 3    have multiple jobs they are responsible for.

 4          Q      Okay.  But in terms of them physically

 5    reporting to work, are they typically physically

 6    reporting to work at a TESSCO or Power Line office?

 7          A      No, they would be at the project.

 8          Q      So, they were staying at hotels, typically?

 9          A      Could be, yes.  Some do.

10          Q      Where else would they stay besides a hotel?

11          A      Some guys have trailers and ...

12          Q      Or, like, a motor home?

13          A      Right.

14          Q      And, so, they are essentially on the road all

15    the time?

16                 MS. REIMINGER:  Objection, vague.

17          A      I don't know if they are on the road all the

18    time.  It depends on projects, timing, schedule.

19          Q      When they are working, are they typically out

20    in the field?

21          A      Yes.

22          Q      So, they are essentially working out of their

23    cars and a hotel room or an RV?

24          A      It depends on the job.  It can be a field

25    trailer they work out of.



```
 1                MS. WALTER:  And I would hope that the
 2   policies and procedures are based in reason.
 3                MS. REIMINGER:  Yeah, but his personal
 4   opinion is of no consequence.
 5                MS. WALTER:  Yeah.  I would hope that
 6   policies and procedures are based in reason.
 7                Are you instructing him not to answer?
 8                MS. REIMINGER:  If you're going to
 9   continue to ask those questions, I will because he's a
10   30(b)(6) witness.
11                MS. WALTER:  We might have to call the
12   court and get the court involved.
13                MS. REIMINGER:  Absolutely.
14        Q    (BY MS. WALTER) How many -- Strike that.
15             You mentioned that there were field
16   secretaries that would intake the receipts.  Can you
17   identify the names of those field secretaries?
18        A    No, I don't know their names offhand.
19        Q    Do you know the names of --
20        A    That can change from time to time.  So, that,
21   I don't keep up with.
22        Q    Do you know the names of any of them?
23        A    Chad Ballows, I believe, is one.
24        Q    Is that a male or a female?
25        A    It's a female.
```



```
 1      Q    Which subsidiary did she work for?

 2      A    Utility division, I believe in transmission.

 3      Q    In the transmission side of the utility

 4   division?

 5      A    Uh-huh.

 6      Q    Is that a "yes"?

 7      A    Yes.

 8      Q    Any others that you can think of?

 9      A    No.

10      Q    Have you ever interacted with Shari Payne?

11      A    Yes.

12      Q    And do you understand her to have held a

13   position as a field secretary, as well?

14      A    I understood her to be office manager.

15      Q    When Mr. Thurmon was working for the company,

16   who was he supposed to turn his receipts in to?

17      A    That, I have no knowledge of.  That was -- I

18   don't know who they might have been turning it in to.

19      Q    Who were the other -- Strike that.

20           Do you know the name of anyone to whom any of

21   the substation superintendents were responsible to turn

22   in their receipts to?

23      A    Not specifically, no.

24      Q    Generally, do you know?

25      A    I'd have to speculate; but Shari Payne, I
```




1   believe, they turned some of the receipts.  Or some of

2   the superintendents may have turned their stuff in to

3   her, but I don't know that for sure.

4        Q    Now, if Ms. Payne were to testify that she

5   would lose receipts from time to time, do you have any

6   evidence to dispute that?

7              MS. REIMINGER:  Objection, vague.

8        A    I'm not sure how to answer that.  I don't, you

9   know, have any knowledge of it one way or the other.

10       Q    So, you couldn't dispute it if she said it?

11       A    Yes.

12       Q    Take a step back for a moment.  You said you

13  met with Ms. Rosas?

14       A    Uh-huh.

15       Q    What topics did you discuss with Ms. Rosas to

16  prepare for your deposition?

17             MS. REIMINGER:  Objection to the extent

18  it involves attorney-client privilege.

19             This was during the meeting with counsel?

20  Is that what you're asking about?

21             MS. WALTER:  But I'm also entitled under

22  Rule 30(b)(6) deponent to understand to whom he talked

23  to and about what subjects, where his source of

24  information is.

25             MS. REIMINGER:  Sure, if you're not



```
 1        Q    Okay.  Nothing comes to mind?

 2        A    No.

 3        Q    Okay.  In your capacity as a controller, do

 4   you have any occasion to interact with any outside human

 5   resource consultants at Power Line?

 6                  MS. REIMINGER:  Objection, vague.

 7        A    I -- Once, a single conversation.  That was

 8   it.  I wasn't participating really in anything, but ...

 9        Q    Was that the Achilles HR consulting firm?

10        A    Yes.

11        Q    And did the topic or discussion have anything

12   to do with wage and hour laws?

13        A    No.

14        Q    Did you speak with any of the company's

15   outside human resource consultants to prepare for your

16   deposition today?

17        A    No.

18        Q    Did you review any written job descriptions

19   for superintendents to prepare for your deposition?

20        A    No.

21        Q    Based on your understanding of a

22   superintendent's principal job duties, would you agree

23   with me that a large part of his responsibilities

24   include submitting proper paperwork to the office and to

25   customers?
```



Page 64

```
 1                MS. REIMINGER:  Objection, vague.
 2        A    No.
 3        Q    You do not agree with that?
 4        A    No.
 5        Q    And why not?
 6        A    In my conversation with Mr. Renteria, he
 7  alluded to he thought about 25 percent of the duties
 8  were related to paperwork.
 9        Q    And you don't feel that -- Strike that.
10             And 25 percent is not a substantial part of a
11  person's job in your viewpoint?
12                MS. REIMINGER:  Objection, vague.
13  Argumentative.
14        A    It would be coming to some personal
15  conclusion.
16        Q    Did Mr. Renteria cite specifically 25 percent?
17        A    Yes.
18        Q    Those were his words?
19        A    Yes.
20        Q    And you had mentioned that the job also
21  entailed hands-on work, correct?
22        A    Correct.
23        Q    Did Mr. Renteria mention a specific percentage
24  of the time that superintendents typically spend on that
25  type of work?
```



1     A    No.

2     Q    Do you know from any other source?

3     A    No.

4     Q    And the supervising of the crew members as a

5  part of a superintendent's job, did Mr. Renteria ascribe

6  a certain percentage of the time that the supervisors do

7  that?

8     A    No, he didn't.

9     Q    Did he mention any other job function that he

10  ascribed a particular percentage of time?

11     A    No.

12              MS. WALTER:  I'm going to mark as

13  Exhibit 5 the "Power Line Services, Inc., Employee

14  Expense Policy" dated March 26, 2010.

15              (EXHIBIT NO. 5 WAS MARKED.)

16     Q    (BY MS. WALTER) Mr. Wasson, have you ever seen

17  this document before?

18     A    (Reviewing document) Yes.

19     Q    And when you testified earlier you reviewed

20  the company's employee expense policy, is this the

21  policy you were referencing?

22     A    Yes.

23     Q    Is this policy still in effect at the present

24  time?

25     A    Not this specific one.  It's been modified.



1    submission of the expense report instead of taking the

2    hard core strict policy of deducting it if you don't

3    turn it in by you mentioned a Tuesday. So, if on

4    Tuesday you don't turn it in, we don't automatically

5    deduct it, no.

6        Q    And how long have you not been doing it that

7    way?

8                MS. REIMINGER:  Objection, form.

9        A    In researching and talking to April and just

10   the way of seeing things when I first started, that

11   appears to have been the company policy - I say policy -

12   but the practice all along, that there wasn't an

13   automatic, hard core, absolute on the policy.

14       Q    Did you talk with Mr. Renteria at all about

15   the deduction policy --

16       A    No.

17       Q    -- to prepare for your deposition?

18       A    No.

19       Q    And you didn't talk to Mr. Chappell, right?

20       A    No.

21       Q    And you didn't talk to Mr. Hallmark?

22       A    No.

23       Q    And you didn't talk to Ms. Payne, correct?

24       A    No.

25       Q    So, do you have any source of information




1  about how they were administering this policy?

2       A    How they specifically?  No, I don't.

3       Q    Was Ms. Rosas involved in the processing of

4  payroll deductions during the time that Mr. Thurmon

5  worked for the company?

6            MS. REIMINGER:  Objection, vague.

7       A    I don't know that.

8       Q    Have you reviewed the Affidavit that Wayland

9  Chappell provided us for this lawsuit to prepare for

10  your deposition?

11      A    No.

12      Q    This notion that it's not automatic and you

13  err on the side of the employee, what is the source of

14  that information?

15           MS. REIMINGER:  Objection, vague.

16      A    The source of that information being from

17  seeing how since I joined the company.

18      Q    How have you seen it in action?

19      A    Understanding that getting feedback that

20  expense reports haven't been turned in timely and we

21  don't then immediately turn around and deduct it.

22      Q    When did you start becoming involved in the

23  processing of payroll deductions done by Total

24  Electrical Service & Supply Company?

25      A    I started becoming aware of it soon after I




Page 106

1    titled "Responsibilities."  And then it begins by

2    listing "Employee" and then "PLS Executive Management

3    Team, Controller, and Accounts Payable Clerk."

4         Am I right to understand that this is listing

5    off the job duties of these specific groups as it

6    relates to employee expenses?

7    A    Yes.

8    Q    And one of the job duties for employees is to

9    follow the travel and expense guidelines set forth in

10   this policy, correct?

11        MS. REIMINGER:  Objection, vague.

12   A    It says it in Section a there, yes.

13   Q    So, in "Employees" job duties included the

14   following in Exhibit 5?

15        MS. REIMINGER:  Objection, vague.

16   A    Part of if they have a company credit card.

17   Q    And another job responsibility of employees is

18   to "submit a weekly PLS Expense Report along with

19   receipts and invoice for payment and no longer than

20   30 days from expense having been incurred."

21        Do you see that?

22   A    Yes.

23   Q    Would you agree that's one of their job

24   responsibilities to turn in these weekly and now

25   semimonthly expense reports and receipts?




1    A    If they have a card and incur expenses, yes.

2    Q    And Section d even says:  "If a Cardholder, an

3  expense report must be submitted weekly, along with a

4  copy of the Credit Card statement, all receipts,

5  documentation and any required approval signatures,"

6  correct?

7    A    Yes.

8    Q    So, it is one of the responsibilities of an

9  employee who has a corporate credit card to turn in

10  receipts?

11    A    Correct.

12    Q    And under Subdivision f, which is on the

13  following page, still listing the responsibilities of

14  employees, it says:  "Corporate Credit Cards are only to

15  be used for professional business use only by PLS

16  employees."

17        Is that one of their responsibilities?

18    A    It's part of their responsibility of having a

19  company credit card is to make sure that nobody uses it

20  besides them, yes.

21    Q    And "It is not to be used to obtain cash

22  advances, bank checks, traveler's checks, or electronic

23  cash transfers or for personal expenses," correct?

24    A    Correct.

25    Q    And "Personal expenses are only allowed with




1    employees act and are acting on the best interests of

2    the company so that the expenses are a business-related

3    expense. So, we don't make every attempt to deduct it

4    because if it is a legitimate expense, then obviously it

5    shouldn't be deducted from their pay. And, so, we're

6    not looking to penalize anybody. It's just part of

7    their fiduciary responsibility for having a company

8    credit card that they have a responsibility to turn that

9    in so we can properly record expenses and make sure they

10   have been properly approved.

11        Q     And if they have lost that receipt?

12        A     If they have lost the receipt, then if the

13   manager says, yes, it's a legitimate business expense,

14   then it's not a problem.

15        Q     And the if the manager doesn't say that?

16        A     If the manager says, no, it's a personal

17   expense, then that would be something that we would -

18   they would in the field the manager would generate the

19   payroll deduction form because it was a personal expense

20   and process that through.

21        Q     Mr. Chappell in Paragraph 4, he testifies

22   about that "about once a month, I'd receive an e-mail

23   from either Crissy Salcido or Shari Payne that listed

24   all employees who had missing receipts for the month.  I

25   would forward the e-mail on to those employees under my




1       A     Yes.

2       Q     And was the policy also intended to discourage

3   undocumented charges?

4                   MS. REIMINGER:  Objection, vague.

5       A     The requirements in following reimbursement

6   and qualifying expenses relative to the IRS requires us

7   to have receipts.  So, in that sense, it's just trying

8   to comply with regulations.

9       Q     And, so, this job function of turning in

10  receipts implicated tax issues, as well, for the

11  company?

12                  MS. REIMINGER:  Objection, vague.

13      A     Potentially, it could come preparation for the

14  tax returns if you have undocumented expenses like that,

15  yes.

16      Q     So, you wanted it to be done properly?

17      A     Correct.

18      Q     During your tenure with the company, are you

19  aware of anyone who is just terrible at preparing their

20  expense reports in terms of turning in the proper

21  documentation and receipts?

22                  MS. REIMINGER:  Objection, vague.

23      A     I'm not aware of any one individual that has

24  continued to be a problem or issue.

25      Q     Have there been instances where it's been a



1    (EXHIBIT NO. 7 WAS MARKED.)

2    Q    (BY MS. WALTER) I'm marking as Exhibit 7 a

3    TESSCO expense policy.

4         Have you ever seen this document before?

5    A    (Reviewing document) No.

6    Q    Now, what is your understanding as you sit

7    here today as to what TESSCO's policy was with respect

8    to payroll deductions for failing to turn in a receipt

9    for a charge to a corporate credit card before

10   Exhibit 5, the Power Line policy, took effect?

11   A    Say that again.  Sorry.

12   Q    Sure.  I'll try.  This will be a challenge.

13        What is your understanding as you sit here

14   today as to what TESSCO's policy was on the topics that

15   are covered in Exhibit 5 before Exhibit 5 took effect?

16   A    That they could deduct for receipts not being

17   turned in or personal expenses occurred on a card.

18   Q    And did that -- Strike that.

19        Was that policy in writing to your knowledge?

20   A    I don't have any knowledge of that.

21   Q    And this policy that's part of Exhibit 7 - it

22   reads:  "TESSCO has my permission to withdraw the needed

23   amounts from my paycheck to cover any and all

24   outstanding personal purchases which may include any

25   current charges that I have incurred for uniform rental,




 1     A     Could.

 2     Q     When you say "T&D," is that short for

 3   transmission --

 4     A     And distribution.

 5     Q     -- and distribution?

 6           And what job classifications did Shari Payne

 7   process payroll deductions for?

 8     A     Don't know directly with that.  I would say no

 9   different than what Crissy would have been.  You know,

10   they worked in the same office; so ...

11                 MS. WALTER:  I'm going to mark as

12   Exhibit 8 a payroll deduction form dated May 13th, 2009.

13                 (EXHIBIT NO. 8 WAS MARKED.)

14     Q     (BY MS. WALTER) Mr. Wasson, did you review

15   Exhibit 8 to prepare for your deposition?

16     A     (Reviewing document) Yes.

17     Q     And the date on the form is May 13th, 2009,

18   correct?

19     A     Yes.

20     Q     What is your understanding as to the

21   circumstances that led to this payroll deduction?

22     A     I don't have any firsthand knowledge of that

23   particular deduction and didn't confer given that

24   Wayland Chappell approved it and Darrell Hallmark signed

25   off on it and neither one -- I had no conversations with

1    either one of them.

2        Q    Did you try to reach Wayland Chappell before

3    your deposition?

4        A    No.

5        Q    Did you try to reach Darrell Hallmark --

6        A    No.

7        Q    -- before your deposition?

8            It's my understanding Mr. Chappell quit his

9    employment with TESSCO, correct?

10       A    I don't - I don't know the circumstances of

11   his leaving the company.

12       Q    Do you know the circumstances of Mr. Hallmark

13   leaving the company?

14       A    I believe he resigned.

15       Q    Are you aware of the company having the

16   ability - the means to contact Mr. Chappell or

17   Mr. Hallmark?

18            MS. REIMINGER:  Objection.  Calls for

19   speculation.

20       A    I don't have any knowledge of that.

21       Q    Okay.  So, you don't know whether they would

22   know how to locate them?

23       A    Correct.

24       Q    So, I understand that you don't have any

25   firsthand knowledge of the circumstances leading to this



1    deduction.  Do you have any kind of hearsay knowledge

2    from any of the preparation work that you did for your

3    deposition as to the circumstances that led to this

4    payroll deduction for Mr. Thurmon?

5         A    No, just that it was done and that the

6    document states it's a lost receipt for Home Depot.

7         Q    Do you have any knowledge of any facts to

8    suggest that Mr. Thurmon had made a personal charge at

9    Home Depot on the corporate credit card?

10             MS. REIMINGER:  Objection.  Calls for

11   speculation.

12        A    I don't have any knowledge of the expense what

13   it's related to.

14        Q    So, you don't know whether it's personal or

15   business?

16        A    Correct.

17        Q    As you sit here today, you can't say

18   definitively it's personal?

19             MS. REIMINGER:  Objection.  Asked and

20   answered.  Calls for speculation.

21        A    I can't answer whether it's business or

22   personal.

23        Q    The reference to "Division 320" - what

24   division is that referencing?

25        A    That would be the substation division.  Oh,




1   done, it should have been using this form.

2        Q    And this form was also used for processing

3   payroll deductions for damage or loss to company

4   property?

5        A    Yes.

6        Q    Is there any other type of payroll deduction

7   that this form was used for that you are aware of?

8        A    Not that I'm aware of.  Just that I guess

9   anything that they were going to deem necessary to

10  deduct would have used this form, but --

11       Q    Are you aware of any other form besides this

12  form in place with respect to payroll deductions by

13  TESSCO in 2009?

14       A    Not that I'm aware of, no.

15            THE VIDEOGRAPHER:  Five minutes.

16       Q    Do you know which Home Depot the purchase had

17  been made at?

18       A    I don't have any knowledge of the expense; so,

19  I don't -- No.

20       Q    Do you know whether the purchase -- Strike

21  that.

22            Do you know whether anyone in the company

23  bothered to investigate whether the Home Depot charge

24  had been made at a Home Depot near Mr. Thurmon's home or

25  a jobsite?




```
 1                    MS. REIMINGER:  Objection.  Calls for
 2   speculation.  Argumentative.
 3        A    I don't have any knowledge of the purchase;
 4   so, I have no idea.
 5        Q    Do you have any knowledge of any investigation
 6   that was conducted to determine whether or not that was
 7   a personal charge or a business charge?
 8                    MS. REIMINGER:  Objection.  Calls for
 9   speculation.
10        A    I don't have any knowledge.
11        Q    Do you have any knowledge whether anyone at
12   the company tried to contact Home Depot for any details
13   related to this charge?
14                    MS. REIMINGER:  Objection.  Calls for
15   speculation.  Asked and answered.
16        A    I have no knowledge of the transaction itself.
17        Q    Now, under the employee signature line, it
18   says:  "Jerry Thurmon by Phone."
19             Do you see that?
20        A    Uh-huh.
21        Q    Was that a "yes"?
22        A    Yes, yes.  Sorry.  Yes.
23        Q    Do you know whether that is Jerry Thurmon's
24   signature there?
25        A    I have no idea what his signature looks like
```



1   to testify to anybody's signature on whether it's theirs

2   or not.

3        Q    Okay.  Do you have any knowledge of what was

4   said in any phone conversation with Mr. Thurman about

5   Exhibit 8?

6        A    Again, I have no knowledge of the transaction

7   itself and the events around the deduction.

8        Q    Is there anyone that's still with the company

9   that you believe would have information about Exhibit 8?

10       A    Not that I'm aware of back in '09, not knowing

11  who may or may not have been here.

12       Q    Okay.  Did you ask Armando Renteria anything

13  about Exhibit 8?

14       A    No.

15       Q    Did you ask Mr. Renteria about any specific

16  deduction that had been made?

17       A    No.

18       Q    On this form that is used as Exhibit 8 under

19  "Deduct" and then it's got three lines and one line

20  says:  "Full amount," one line says:  "2 paychecks" and

21  the third line says:  "Other" --

22       A    Yes.

23       Q    -- what was the company's policy or practice

24  at this time for determining whether a deduction would

25  be made in a full amount or split between two paychecks




1              MS. REIMINGER:  Objection.  Calls for

2    speculation.

3         A    I don't have any knowledge of that.

4         Q    In reviewing Exhibit 8, is there anything out

5    of the ordinary for this deduction that jumps out at

6    you?

7              MS. REIMINGER:  Objection, vague.

8         A    (Reviewing document) Can you go ahead and ask

9    it again?  Sorry.

10        Q    In reviewing Exhibit 8, is there anything

11   unusual or out of the ordinary that jumps out at you?

12             MS. REIMINGER:  Objection, vague.

13        A    No.

14             MS. WALTER:  I'm going to mark as

15   Exhibit 9 a PR Employee Sequence Detail.

16             (EXHIBIT NO. 9 WAS MARKED.)

17        Q    (BY MS. WALTER) What do you -- Strike that.

18             This was a page of a multipage report that was

19   produced to us by the defendants in this lawsuit.

20             Is there a particular term that you use to

21   call this report, like a shorthand way of referring to

22   it, at Power Line?

23        A    No.  Just, you know, a payroll history.  But I

24   mean, it's --

25        Q    Okay.  Are you familiar with this form?



1      A      I haven't looked at this report before, no.

2      Q      Not this particular report, but have you ever

3   looked at the payroll history forms for Power Line?

4      A      Well, not this report, the sequence report

5   that you have given me, no.

6      Q      Not only for Jerry Thurmon, but for anyone?

7      A      Not this particular report, no.

8      Q      Okay.  Under EDL Type, that column, what is

9   that short for?

10     A      Employee deductions and liabilities.

11     Q      And if we look under the week ending May 17,

12  2009, the third line that says:  "D 1 Advance, 1" and

13  then "1,500, 1,500" and it's got the "15.38" which

14  appears to match the deduction amount for Exhibit 8,

15  correct?

16     A      Okay.

17     Q      What is the reference to a "D" in the EDL Type

18  column?

19     A      Deduction.

20     Q      Then the "EDL Code 1 Advance," what does that

21  mean?

22     A      That's just the type, and the "1" is just a

23  number that's assigned to the various employee ending,

24  earnings and deductions and liability codes that we have

25  set up as part of payroll.




1    Q    Now, to me, an advance makes it sound like

2    Mr. Thurmon took some sort of payroll advance.

3         Would you agree?

4              MS. REIMINGER:  Objection.  Calls for

5    speculation.

6    A    It is treated as a deduction against - in that

7    earnings code and posted to employee advance, which is

8    then where we would post the offsetting charge on the

9    credit card, say, if that would be the case.  So, it's

10.  the clearing account we just run the transactions

11   through.

12   Q    For these payroll deductions for lost

13   receipts, do you always use the 1 Advance EDL Code?

14   A    They should be, yes.

15   Q    Is the EDL Code used for any other purpose

16   besides payroll deductions for lost receipts?

17   A    That, I don't know.

18   Q    And then the "Pay Seq" column - what is that

19   short for?

20   A    Pay sequence, which is --

21   Q    And then -- Okay.  Go ahead.

22   A    -- which is processing within the system

23   itself, just an identifier.

24   Q    And then in that line that we were looking at

25   that reflects the $15.38 deduction that had been made to



1      Q    Okay.   In preparing for this deposition, did

2  you have any discussions with anyone about the fact that

3  in another case that's been filed by a man named Norman

4  Jarrett and Jerry Thurmon for wrongful termination of

5  employment, that the defendants are alleging one of the

6  reasons they fired Norman Jarrett was because he had too

7  many accidents in company vehicles?  Did you discuss

8  that at all?

9      A    No.

10               MS. REIMINGER:   Objection.

11               And to the extent it asks for privileged

12  communication, I instruct you not to answer.

13     Q    To your knowledge, when the company entrusts a

14  company vehicle with an employee, it is the employee's

15  responsibility to maintain the condition of that

16  vehicle, correct?

17     A    Correct.

18     Q    And they can't intentionally damage the

19  vehicle, correct?

20     A    Correct.

21     Q    They can't recklessly damage it, as well, like

22  slam it into a wall?

23     A    Not supposed to.

24     Q    Not supposed to, right?  Is one of the job

25  functions to maintain that property in good condition?



1                MS. REIMINGER:  Objection, vague.

2        A    Let's see.  The employee is responsible to

3    maintain all company property of any nature.

4        Q    And that would include company vehicles that

5    are entrusted into their care?

6        A    Yes.

7                (EXHIBIT NO. 10 WAS MARKED.)

8        Q    (BY MS. WALTER) I have marked as Exhibit 10 a

9    payroll deduction dated June 1st, 2009.

10               Did you review this document to prepare for

11   your deposition?

12       A    (Reviewing document) Yes.

13       Q    It's dated June 1st, 2009, correct?

14       A    Correct.

15       Q    What were the circumstances that led to this

16   deduction?

17       A    I don't know the specific facts except to -

18   damage to a company property, to a piece of equipment.

19       Q    So, you don't know any of the details of what

20   happened to that equipment?

21       A    No.

22       Q    And you don't know any details about what

23   repairs needed to be made?

24       A    No.

25       Q    And you don't know whether, in fact, repairs




1    were made for other accidents caused by other employees?

2         A    I'm not aware of any other specific accidents

3    of any nature, no.

4         Q    It appears to be signed by Armando Renteria

5    and Darrell Hallmark, correct?

6         A    Yes.

7         Q    Is there any reason why you didn't discuss

8    this with Mr. Renteria before your deposition today?

9         A    No specific reason.  I just did not ask him.

10        Q    It appears in at least reading the form that

11   the company planned to make $2500 in deductions to

12   Mr. Thurmon's salary, correct?

13        A    It appears that, yes.

14        Q    And it appears from just reading the form that

15   these deductions would be made over time with $100 every

16   week deducted until the $2500 was finally paid out,

17   correct?

18        A    Correct.

19        Q    Do you know who decided to make those

20   deductions?

21        A    The decision to ultimately make the deduction

22   would be Armando and Darrell.

23        Q    And are you assuming that because they signed

24   the form?

25        A    Darrell as vice president of the division




1  would have authority to make that decision, yes.

2      Q    I know he would have authority, but are you

3  assuming that he actually made that decision just

4  because his signature is on the form?

5              MS. REIMINGER:  Objection, vague.

6      A    Based on his position, he would be the one to

7  approve that.

8              MS. WALTER:  Objection, nonresponsive.

9      Q    (BY MS. WALTER) Did Mr. Hallmark ever tell you

10 he made the decision to make this deduction?

11     A    I never had a conversation with him related to

12 this one specific incident.

13     Q    Okay.  Did Mr. Renteria ever tell you he made

14 the decision to make this deduction?

15     A    No.

16     Q    Did anyone outside the company ever tell you

17 that Armando Renteria or Darrell Hallmark made the

18 decision to make this deduction?

19     A    No.

20     Q    So, is it correct that you're assuming that

21 they made the deduction or decision to make the

22 deduction?

23              MS. REIMINGER:  Objection, argumentative.

24 Calls for speculation.

25     A    Based on the approval authorities, yes, he's



PDF-XChange Click to buy NOW! www.docu-track.com

authorized to prove that.

Q It may be a reasonable assumption; but you're just assuming that, correct?

MS. REIMINGER: Objection, argumentative. Asked and answered.

A Based on the company's practices, yes, I am.

Q As you look at Exhibit 10, is there anything that jumps out at you as unusual or out of the ordinary?

MS. REIMINGER: Objection, vague.

A I'm not sure what you're asking.

Q Well, is there anything that strikes you as unusual about Exhibit 10?

MS. REIMINGER: Objection, vague.

A No.

Q Did you review the vehicle incident report that TESSCO had in its files related to this accident to prepare for this deposition?

A No.

Q Do you have any knowledge as to whether or not the damage to the company vehicle occurred while on company business or personal business?

A I don't have any knowledge.

Q Going back to that payroll registry that we've marked as 9, it appears to show a $15.38 deduction was made to Mr. Thurmon's pay on May 17th, 2009.

1          Would you agree with that?

2     A    It appears so, yes.

3     Q    Other than the possible link to the payroll

4   deduction form that we've marked as Exhibit 8 which also

5   reflects that same unique amount of 15.38, are you aware

6   of that line being for anything other than the deduction

7   that we've identified as Exhibit 8?

8          MS. REIMINGER:  Objection, compound.

9     A    (Reviewing document) No.

10    Q    And in case that was a wordy question, you

11  just don't know it to be anything else is what I'm

12  trying to get to.

13    A    Correct.

14         MS. WALTER:  Now, I'm going to show you

15  what I'll mark as Exhibit 11, which it is more pages of

16  that payroll history report.

17         (EXHIBIT NO. 11 WAS MARKED.)

18    A    (Reviewing document) Okay.

19    Q    (BY MS. WALTER) And you'll see beginning on

20  the payroll of May 31st, 2009, in the fourth line

21  there's these D 1 Advance amounts of $100.  And that

22  will start continuing throughout the subsequent

23  payrolls.  Do you see those 100-dollar deductions?

24    A    Yes.

25    Q    Okay.  Did you review any part of this --



1    Strike that.  You already testified that you hadn't.

2    I'm sorry.

3            Are you aware of these 100-dollar deductions

4    that were taken on a weekly basis for 25 weeks beginning

5    May 31st, 2009, being anything other than for the

6    payroll deduction that is reflected in Exhibit 10?

7        A    No.

8        Q    So, it's fair to say these appear to be the

9    payroll deductions for the damage to the company truck?

10       A    Correct.

11       Q    I'll represent to you that I've counted them,

12   and there are 25th.  So, if you want to take a moment to

13   count them, you may.

14       A    I'll believe you.

15       Q    It's a predicate to my next question.  I'm

16   going to show you some e-mails that have been introduced

17   in this case by defendants.

18           Actually, strike that.  This was the other

19   case.  I just noticed that.

20           Were you aware of any additional moneys that

21   Mr. Thurmon owed beyond the $2500 in deductions that

22   were made for that deduction form that we've marked as

23   Exhibit 10?

24       A    For that particular deduction, no.

25       Q    Were you aware of there being any balance due




1    from him at his termination of employment for that

2    damage incident?

3         A    Not that I'm aware of, no.

4         Q    Did you speak with Sheila Hicks to prepare for

5    your deposition today?

6         A    No.

7         Q    Is Ms. Hicks still with the company?

8         A    No.

9              MS. WALTER:   I'll show you what I'll mark

10   as Exhibit 12, a payroll deduction form dated July 8th,

11   2010.

12             (EXHIBIT NO. 12 WAS MARKED.)

13        Q    (BY MS. WALTER) Did you review this document

14   for your deposition?

15        A    (Reviewing document) Yes.

16        Q    It's dated July 8th, 2010, correct?

17        A    Yes.

18        Q    Had you started with the company yet as of

19   July 8th?

20        A    July 5th, I think.

21        Q    Did you have any personal involvement in this

22   deduction?

23        A    No.

24        Q    Can you describe for me the circumstances that

25   led to this deduction?











PDF-XChange Click to buy NOW! www.docu-track.com

A Just that it was a charge - phone-related charge. It appears to be some accessory that was not authorized by the company as part of having a company cell phone.

Q Was that a company cell phone issued to Mr. Thurmon?

A It probably was a credit card charge. I don't know if he just went out and bought something. Obviously it wouldn't show up. So, I'm assuming that it's a credit card charge for an accessory for the cell phone that he had.

And if I go out and buy an accessory to the phone, if I put it on my card, it's not company approved.

Q It sounds like you're speculating here. Did you have any discussions with Armando Renteria about Exhibit 12 to prepare for your deposition?

A No.

Q Did you have any discussions with Wayland Chappell about Exhibit 12 to prepare for your deposition?

A No.

Q Did you have any discussions with any other current or former TESSCO employee about Exhibit 12 to prepare for your deposition?

1        A    No.

2        Q    Did you have any discussions with any other

3   former or current Power Line employee about Exhibit 12

4   to prepare for your deposition?

5        A    No.

6        Q    So, you can read it and kind of make some

7   reasonable interpretations of the form; but you don't

8   have any personal knowledge related to it, correct?

9        A    Correct.

10       Q    And you haven't been told by any other company

11  employee either past or current the details of what

12  happened with this deduction?

13       A    No.

14       Q    Do you even know who Sam Gomez is?

15       A    I don't know Sam.

16       Q    Do you know as you sit here today any facts

17  that suggest this was a personal charge for something

18  Mr. Thurmon bought for himself?

19            MS. REIMINGER:  Objection.  Calls for

20  speculation.

21       A    Firsthand actual knowledge?  No.

22       Q    Any hearsay knowledge, like, did somebody tell

23  you that?

24       A    No.

25       Q    Do you know whether Mr. Gomez was the person



1   who made the charge or Mr. Thurmon?

2                   MS. REIMINGER: Objection. Calls for

3   speculation.

4       A    I have no knowledge.

5       Q    There is no employee signature, correct?

6       A    Correct.

7       Q    As of July 8th, 2010, would the company

8   process a payroll deduction even if there wasn't an

9   employee signature on the payroll deduction form?

10      A    They could.

11      Q    I know you said you didn't know who Mr. Gomez

12  was. Do you happen to know whether he was issued a

13  corporate credit card?

14      A    No, I don't.

15                  MS. WALTER: I'm going to mark as

16  Exhibit 13 another couple of pages of that payroll

17  history report for Mr. Thurmon.

18                  (EXHIBIT NO. 13 WAS MARKED.)

19      Q    (BY MS. WALTER) At the -- For the payroll

20  dated July 11, 2010, which is at the bottom of the first

21  page of Exhibit 13, the very last line of that payroll

22  on Page 59 shows a deduction of $10.82.

23                  Do you see what line I'm referring to?

24                  MS. REIMINGER: Objection.

25                      10.81.




Page 169

```
 1                    MS. WALTER:  Did I say something else?
 2                    MS. REIMINGER:  You said "10.82."
 3        Q    (BY MS. WALTER) Can you see that?  I'm sure
 4   you can't see the line for 10.82.
 5        A    (Reviewing document) I see, yeah.  No, I don't
 6   see 10.82.
 7        Q    10.81.  So, we're on the same line.  That
 8   appears to match Exhibit 12, correct?
 9        A    Appears, yes.
10        Q    Do you have any knowledge as to whether or not
11   this was a deduction from Mr. Thurmon's pay that was
12   associated with Exhibit 12?
13        A    No, I don't have firsthand knowledge that's
14   specifically what it's for.
15        Q    Do you have any knowledge as to it being for
16   anything other than what is part of Exhibit 12?
17        A    No.
18                    MS. WALTER:  I'm going to mark as
19   Exhibit 14 a Payroll Deduction Form dated July 22, 2010?
20                    (EXHIBIT NO. 14 WAS MARKED.)
21        Q    (BY MS. WALTER) Did you review Exhibit 14 to
22   prepare for your deposition?
23        A    (Reviewing document) Yes.
24        Q    And it's dated July 22nd, 2010, correct?
25        A    Correct.
```



1      Q    As you sit here today, do you have any

2    knowledge of any personal charge that Mr. Thurmon made

3    to a corporate credit card?

4              MS. REIMINGER:  Objection, vague.

5      Q    Even if it's not in the documents that we've

6    referenced, just do you know of an instance where, for

7    example, he was viewing porn on his computer and charged

8    it to the company, anything like that?

9              MS. REIMINGER:  Objection, vague.

10     A    I have no knowledge of any actual expenses,

11   business or personal, of what he actually charged.

12             MS. WALTER:  I'm going to mark as

13   Exhibits 18 and 19 because they go together, TESSCO's

14   Interrogatory Responses and then a chart that came with

15   it.

16             (EXHIBIT NOS. 18 AND 19 WERE MARKED.)

17             MS. REIMINGER:  And just as we discussed

18   before, all of the things marked CONFIDENTIAL, we would

19   ask that they be designated in the deposition transcript

20   as CONFIDENTIAL.

21     Q    (BY MS. WALTER) Have you ever seen Exhibit 19

22   before?

23     A    (Reviewing document) No.

24     Q    The last page of Exhibit 19 is what we call a

25   verification form.  And it's verified by Larry - how do




1  issued a corporate cell phone?

2      A   Not a specific policy that says to a certain

3  level.  And it's not that it's even just as a general

4  manager or anything.  So, it's just kind of on an

5  individual basis you hire somebody depending on what

6  they are doing if it's determined that they might be

7  better served by having a cell phone.

8      Q   And would you agree with me that if an

9  employee is issued a corporate cell phone, that they

10 have a duty to not incur a lot of personal charges on

11 it?

12     A   Correct.

13     Q   And would you agree with me that if an

14 employee did ring up exorbitant personal charges on a

15 corporate cell phone, the company would have the

16 discretion to write them up?

17     A   The management would have the discretion to

18 write their employees up for any number of reasons.  I

19 suppose that could be one of them.

20     Q   And could a manager also have the discretion

21 to terminate an employee for abusing a corporate cell

22 phone by incurring a lot of personal charges?

23     A   Given they have the hiring and firing

24 responsibilities, they could.  Most likely, the

25 speculation would be we'd just take the phone away.

Page 196

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION

3    JERRY THURMON, WAYNE        )  CIVIL ACTION
     THURMON, and OTHERS         )  NO.: 4:11-cv-01365
4    SIMILARLY SITUATED,         )
              Plaintiffs,        )
5                                )
     VS.                         )
6                                )  COLLECTIVE ACTION
     POWER LINE SERVICES,        )  REQUESTED
7    INC.; TOTAL ELECTRICAL      )
     SERVICE & SUPPLY CO.; and   )
8    SUN ELECTRIC SERVICES,      )
     INC.,                       )
9                                )
              Defendants.        )  JURY TRIAL DEMANDED
10

11                 REPORTER'S CERTIFICATION
              DEPOSITION OF FREDERICK C. WASSON
12                    March 7, 2012

13       I, David S. Smith, RPR, Certified Shorthand Reporter

14   in and for the State of Texas, hereby certify to the

15   following:

16       That the witness, FREDERICK C. WASSON, was duly

17   sworn by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20       That the deposition transcript was submitted on

21   _____, 2012, to the witness or to the

22   attorney for the witness for examination, signature and

23   return to me by _____, 2012;

24       That the amount of time used by each party at the

25   deposition is as follows:

Ms. April Walter.....4 HOURS:27 MINUTES

Ms. Hallie Reiminger.....NO TIME USED

     That pursuant to information given to the deposition

officer at the time said testimony was taken, the

following includes counsel for all parties of record:

FOR THE PLAINTIFF:
    Ms. April L. Walter

FOR THE DEFENDANT:
    Ms. Hollie Reiminger

     I further certify that I am neither counsel for,

related to, nor employed by any of the parties or

attorneys in the action in which this proceeding was

taken, and further that I am not financially or

otherwise interested in the outcome of the action.

     Further certification requirements pursuant to Rule

203 of TRCP will be certified to after they have

occurred.

     Certified to by me this 21st of March,

2012.

David S. Smith, CSR, RPR
Texas CSR No. 4166
Expiration Date:  12/31/12
Charlotte Smith Reporting, Inc.
1116 Naylor Street, Suite C
Houston, Texas  77002
DSMITH@SIMPLECHARLOTTE.COM
713.523.5400

CONCORDANCE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JERRY THURMON, | § | CIVIL ACTION NO. 4:11-cv-01365 |
| WAYNE THURMON, | § | |
| and OTHERS SIMILARLY | § | |
| SITUATED, | § | |
|     Plaintiffs, | § | |
| | § | |
| VS. | § | COLLECTIVE ACTION REQUESTED |
| | § | |
| POWER LINE SERVICES, | § | |
| INC., TOTAL ELECTRICAL | § | |
| SERVICE & SUPPLY CO., and | § | |
| SUN ELECTRIC SERVICES, INC., | § | |
|     Defendants. | § | JURY TRIAL DEMANDED |

### PLAINTIFFS' NOTICE OF INTENTION TO DEPOSE
### CORPORATE REPRESENTATIVE(S) UNDER FEDERAL RULE 30(b)(6)

TO:    Defendant Total Electrical Service & Supply Co., by and through its attorneys of record, R. Glen Rigby, Laurence E. Stuart, Cheri Thomas, and Hollie L. Reiminger, Stuart & Associates P.C., 909 Fannin, Suite 3250, Houston, Texas 77010.

Please take notice that Plaintiffs Jerry Thurmon, et al., pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, will take the oral deposition(s) of Defendant Total Electrical Service & Supply Co. ("Defendant") through its corporate representative(s) beginning on March 7, 2012, at 9:00 a.m., and continuing thereafter from day to day until completed. The deposition will occur before a certified shorthand reporter at Defendant's counsel's office located at Stuart & Associates, P.C., 909 Fannin, Suite 3250, Houston, Texas 77010. The deposition may also be videotaped.

Pursuant to Rule 30(b)(6), Defendant shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on Defendant's behalf, and may set forth, for each person designated, the matters on which that person shall testify.

1



Any person(s) designated to testify must be competent and prepared to testify on behalf of Defendants on the following subjects:

1.  **POLICIES AND PRACTICES FOR PAYROLL DEDUCTIONS:**
    Defendant's policies and practices for making any deductions to the pay of Substation Superintendents, or any similarly situated employees, in the period from April 2008 to the present for: (a) Any credit card charges for which the employee has not provided an itemized receipt or a receipt could not be located evidencing the business-related nature of the charge; (b) Any personal charges (e.g., personal telephone calls or text messages) made to a company-provided cell phone; and/or (c) lost or damaged company equipment or property.

2.  **PAYROLL DEDUCTIONS:** All payroll deduction forms that have been produced in this litigation and the process for making and circumstances surrounding those deductions, including, but not limited to, the payroll deduction forms produced as Bates TESSCO2 77-79, TESSCO2 112, and TESSCO2 244-251.

3.  **JOB DESCRIPTIONS AND DUTIES:** The job descriptions and duties of Substation Superintendents in the period from April 2008 to the present.

4.  **OVERTIME EXEMPT OR NON-EXEMPT STATUS:** The overtime exempt or non-exempt status of Substation Superintendents in the period from April 2008 to the present.

5.     **WITNESSES:** Defendants' employees who had control over deductions made to the pay of Substation Superintendents, and any similarly situated employees, in the period from April 2008 to the present.

6.     **POWER LINE'S EMPLOYEE EXPENSE POLICY AND DEDUCTIONS:** The application of the Power Line Employee Expense Policy (Bates TESSCO2 66-75) to your employees, and any other policy(s) that Defendant Power Line Services, Inc. has implemented for your employees that may result in irregular deductions to salaried employees, including but not limited to, deductions for telephone charges, lost or damaged uniforms, or lost or damaged company equipment or property.

Within a reasonable time before the deposition is scheduled to be taken, please provide the names and titles of any person(s) designated to give testimony and identify the specific areas outlined above about which each such person shall be tendered as a knowledgeable witness for Defendant.

Because Magistrate Judge Johnson has bifurcated discovery into a first phase related to Plaintiffs' motion for conditional certification as a collective action and subsequent phase related to the merits of Plaintiffs' claims, Plaintiffs reserve all rights to depose Defendant's corporate representative(s) on additional merits-based topics after the filing of Plaintiffs' motion for conditional certification as a collective action.

3

Respectfully submitted,

_/Michael A. Starzyk/_
**Michael A. Starzyk**
Attorney-in-Charge
TBA # 00788461
Southern District of Texas Bar No.16926
**April L. Walter**
TBA # 24052793
Southern District of Texas Bar No. 713287
**Hessam Parzivand**
TBA # 24071157
Southern District of Texas Bar No. 1129776

**STARZYK & ASSOCIATES, P.C.**
10200 Grogan's Mill Road
Suite 300
The Woodlands, Texas 77380
T: [281] 364-7261
F: [281] 364-7533

**ATTORNEYS FOR PLAINTIFFS,
JERRY THURMON, WAYNE THURMON and
OTHERS SIMILARLY SITUATED**

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day February, 2012, I served the foregoing on the

following:

R. Glen Rigby
Laurence E. Stuart
Cheri Thomas
Hollie L. Sawyers
STUART & ASSOCIATES P.C.
909 Fannin, Suite 3250
Houston, Texas 77010
Attorneys for Defendants
*Via* Facsimile

_/s/ Hessam Parzivand_
Hessam Parzivand

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **JERRY THURMON,** | § | **CIVIL ACTION NO. 4:11-cv-01365** |
| **WAYNE THURMON,** | § | |
| **and OTHERS SIMILARLY** | § | |
| **SITUATED,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **COLLECTIVE ACTION REQUESTED** |
| | § | |
| **POWER LINE SERVICES,** | § | |
| **INC., TOTAL ELECTRICAL** | § | |
| **SERVICE & SUPPLY CO., and** | § | |
| **SUN ELECTRIC SERVICES, INC.,** | § | |
| **Defendants.** | § | **JURY TRIAL DEMANDED** |

## PLAINTIFFS' NOTICE OF INTENTION TO DEPOSE
## CORPORATE REPRESENTATIVE(S) UNDER FEDERAL RULE 30(b)(6)

TO:     Defendant Power Line Services Inc., by and through its attorneys of record, R. Glen Rigby, Laurence E. Stuart, Cheri Thomas, and Hollie L. Reiminger, Stuart & Associates P.C., 909 Fannin, Suite 3250, Houston, Texas 77010.

Please take notice that Plaintiffs Jerry Thurmon, et al., pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, will take the oral deposition(s) of Defendant Power Line Services, Inc. ("Defendant") through its corporate representative(s) beginning on March 7, 2012, at 9:00 a.m., and continuing thereafter from day to day until completed. The deposition will occur before a certified shorthand reporter at Defendant's counsel's office located at Stuart & Associates, P.C., 909 Fannin, Suite 3250, Houston, Texas 77010. The deposition may also be videotaped.

Pursuant to Rule 30(b)(6), Defendant shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on Defendant's behalf, and may set forth, for each person designated, the matters on which that person shall testify.



1

Any person(s) designated to testify must be competent and prepared to testify on behalf of Defendants on the following subjects:

1.   **POLICIES AND PRACTICES FOR PAYROLL DEDUCTIONS:** Defendant's policies and practices for making any deductions to the pay of Substation Superintendents, or any similarly situated employees, in the period from April 2008 to the present for: (a) Any credit card charges for which the employee has not provided an itemized receipt or a receipt could not be located evidencing the business-related nature of the charge; (b) Any personal charges (e.g., personal telephone calls or text messages) made to a company-provided cell phone; and/or (c) lost or damaged company equipment or property.

2.   **PAYROLL DEDUCTIONS:** All payroll deduction forms that have been produced in this litigation and the process for making and circumstances surrounding those deductions, including, but not limited to, the payroll deduction forms produced as Bates TESSCO2 77-79, TESSCO2 112, and TESSCO2 244-251.

3.   **JOB DESCRIPTIONS AND DUTIES:** The job descriptions and duties of Substation Superintendents in the period from April 2008 to the present.

4.   **OVERTIME EXEMPT OR NON-EXEMPT STATUS:** The overtime exempt or non-exempt status of Substation Superintendents in the period from April 2008 to the present.

2

5.   **WITNESSES:** Defendants' employees who had control over deductions made to the pay of Substation Superintendents, and any similarly situated employees, in the period from April 2008 to the present.

6.   **DEFENDANT'S    EMPLOYEE    EXPENSE    POLICY    AND DEDUCTIONS:**  The application of the Power Line Employee Expense Policy (Bates TESSCO2 66-75) to employees at Defendant Total Electrical Service & Supply Co. and/or Sun Electric Services, Inc., and any other policy(s) that Defendant has implemented for employees of Defendant Total Electrical Service & Supply Co. and/or Sun Electric Services, Inc. that may result in irregular deductions to salaried employees, including but not limited to, deductions for telephone charges, lost or damaged uniforms, or lost or damaged company equipment or property.

Within a reasonable time before the deposition is scheduled to be taken, please provide the names and titles of any person(s) designated to give testimony and identify the specific areas outlined above about which each such person shall be tendered as a knowledgeable witness for Defendant.

Because Magistrate Judge Johnson has bifurcated discovery into a first phase related to Plaintiffs' motion for conditional certification as a collective action and subsequent phase related to the merits of Plaintiffs' claims, Plaintiffs reserve all rights to depose Defendant's corporate representative(s) on additional merits-based topics after the filing of Plaintiffs' motion for conditional certification as a collective action.

3

Respectfully submitted,


_/Michael A. Starzyk/_
**Michael A. Starzyk**
Attorney-in-Charge
TBA # 00788461
Southern District of Texas Bar No.16926
**April L. Walter**
TBA # 24052793
Southern District of Texas Bar No. 713287
**Hessam Parzivand**
TBA # 24071157
Southern District of Texas Bar No. 1129776

**STARZYK & ASSOCIATES, P.C.**
10200 Grogan's Mill Road
Suite 300
The Woodlands, Texas 77380
T: [281] 364-7261
F: [281] 364-7533

**ATTORNEYS FOR PLAINTIFFS,
JERRY THURMON, WAYNE THURMON and
OTHERS SIMILARLY SITUATED**

4

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day February, 2012, I served the foregoing on the

following:

R. Glen Rigby
Laurence E. Stuart
Cheri Thomas
Hollie L. Sawyers
STUART & ASSOCIATES P.C.
909 Fannin, Suite 3250
Houston, Texas 77010
Attorneys for Defendants
*Via* Facsimile

<u>*/s/ Hessam Parzivand*</u>
Hessam Parzivand

5